**STATE of Minnesota, Respondent,**

v.

**Jesse Lee CURTIS, Appellant.**

**No. 49258.**

Supreme Court of Minnesota.

July 3, 1980.

C. Paul Jones, Public Defender, Kathy A. King and Catherine A. Ludden, Asst. Public Defenders, Minneapolis, for appellant.

Warren Spannaus, Atty. Gen., St. Paul, Thomas L. Johnson, County Atty., Vernon E. Bergstrom, Asst. County Atty., Chief, Appellate Section, David Larson and Michael H. McGlennen, Asst. County Attys., Minneapolis, for respondent.

Heard before PETERSON, KELLY, and WAHL, JJ., and considered and decided by the court en banc.

WAHL, Justice.

Defendant Jesse Lee Curtis was convicted of criminal sexual conduct in the third degree in violation of Minn.Stat. § 609.-344(b) (1978) [1] and sentenced to a term not

1. Minn.Stat. § 609.344 (1978) provides in relevant part as follows:

to exceed seven years. He appeals, arguing that the evidence was not sufficient to support a guilty verdict, that the prosecutor's closing argument constituted prejudicial misconduct, and that the trial court erred in failing to instruct the jury regarding the lesser included offense of criminal sexual conduct in the fourth degree. We affirm.

The complainant in this case, 14-year-old Robbie Jean Ward, is markedly mentally retarded. On January 5, 1978, Robbie was home from her special education ninth grade class for Christmas vacation, "babysitting" for her 10-year-old brother, Roy, and two other small children. The defendant, Jesse Lee Curtis, a 49-year-old black man, was an employee of the Folwell Junior High School, where Robbie attended school, and a family friend. Curtis also worked as property manager for a number of buildings and, until December 15, 1977, had been manager of 2518 Emerson Avenue South, the building in which the Ward family lived. On the afternoon of January 5, defendant met with Mike Kudingo, the former caretaker, at the building and, responding to his message "beeper," twice went to the Wards' apartment to use their telephone, as Kudingo did not have one.

Shortly after 2:10 p. m., Robbie's mother, Roberta Ward, who worked as a bus driver for preschool children, returned home with two women friends. Mrs. Ward found defendant in the apartment with the children. She was not surprised to see him there; he had known the family for several years.

When she entered the apartment, Mrs. Ward was angry and excited because she had discovered the lock on her mailbox was broken and believed that her estranged husband had stolen Social Security checks she was expecting. She telephoned her husband to remonstrate with him, but Mr. Ward denied the theft. Mrs. Ward asked the children whether their father had been there and they said he had not. She also telephoned the police and reported the theft. Some ten or fifteen minutes after arriving home, Mrs. Ward and the other women again left. Mr. Curtis volunteered to stay at the apartment until the police arrived.

At 2:45 p. m., Officers David Lindman and Ronald Bender of the Minneapolis Police Department received a call to investigate a theft at the Wards' apartment. They arrived two or three minutes later and were met by three small children. The policemen told the children they should call back when a responsible adult was present, and then left the premises.

At 3:10 p. m., Mrs. Ward telephoned the apartment to find out whether the police had come. She spoke to her son, Roy, then to Mr. Curtis, and then to Robbie. Curtis told Mrs. Ward that he'd taken an end table from Apartment 9, the only basement apartment in the building, and brought it up for Robbie to use as a stand for the stereo she had received as a Christmas gift. Mrs. Ward thanked him and asked to speak to Robbie. Robbie "sounded upset," so two or three minutes after making the first telephone call, Mrs. Ward called again. This time Robbie sounded hysterically upset, more upset than Mrs. Ward had ever seen or heard her. Robbie was crying and babbling incoherently, so Mrs. Ward told her to "take a deep breath" twice. Robbie herself was declared incompetent to testify, but Mrs. Ward was permitted to testify that after three or four minutes Robbie was able to tell her mother that "Mr. Curtis put his thing in me and I hurt."

Mrs. Ward returned to her apartment close to 4 p. m. with her employer and another friend. The women spoke to Robbie and waited for police to arrive. Offi-

---

CRIMINAL SEXUAL CONDUCT IN THE THIRD DEGREE. A person is guilty of criminal sexual conduct in the third degree and may be sentenced to imprisonment for not more than ten years, if he engages in sexual penetration with another person and any of the following circumstances exists:

\* \* \* \* \* \*

(b) The complainant is at least 13 but less than 16 years of age and the actor is more than 24 months older than the complainant and not in a position of authority over the complainant. \* \* \* Consent by the complainant is not a defense \* \* \*.

cers Lindman and Bender were notified at 4:25 p. m. by radio to "check a criminal sexual assault with a child" and proceeded to the Wards' apartment. They investigated Apartment 9, the only basement apartment in the building, and observed that it was full of litter and abandoned furniture. They also observed one wet stain on the mattress cover.

Officers Lindman and Bender transported Robbie to Hennepin County Medical Center, where medical staff performed a sexual examination on Robbie, following the prescribed procedure for evaluation of alleged assaults. Mucus and seminal fluid were detected in the vagina and on the pubic hair. An external examination revealed a recent one-half-centimeter tear at the entrance to the vagina. The medical testimony indicated that these results were compatible with recent sexual intercourse, during which penetration necessarily occurred. Swabs of the seminal fluid and mucus found inside and outside the vagina were preserved in sterile saline solution and refrigerated.

Officer Lindman took Robbie's slacks and underpants and these samples to the Bureau of Criminal Investigation Laboratory. Police returned to the Wards' apartment building and photographed the wet stain. They then cut the surrounding fabric and took it to the police department laboratory for testing. This patch contained seminal fluid. Tests performed on this seminal fluid, as well as on the seminal fluid on Robbie's clothing and on the vaginal swab, indicated that the semen was that of a "nonsecretor," that is, an individual whose blood type is not ascertainable from his bodily secretions, such as saliva, perspiration, and seminal fluid. Testing of specimens obtained from defendant revealed that he is among the twenty percent of the population which are nonsecretors.[2]

Officers Lindman and Bender were seated in their parked squad car at 2518 Emer-

son Avenue South at 5:30 p. m., when Mr. Curtis drove back to the apartment building to meet again with Mike Kudingo. The policemen observed that Curtis matched the description Mrs. Ward had given them, asked his name, and, when he told them, arrested him. They summoned Officers Reynolds and Bernstrom of the Bureau of Investigation to transport Curtis to police headquarters.

Officer Bernstrom testified at trial that while he and Reynolds were transporting Curtis to police headquarters Curtis stated, "This is crazy, I never touched Robbie Ward," at a time when Robbie's name had not been mentioned by anyone in Curtis' presence. The following day, Curtis was interviewed by Officer LuAnn Lorenson at Hennepin County Jail and again insisted that he "didn't do anything" to Robbie Ward. Officer Lorenson asked him how he knew Robbie Ward was involved in this incident. He replied that "that was the only place he'd been," and admitted that the arresting officers had not told him the name of the complainant at the time he made the statement.

■ 1. Defendant argues, first, that the evidence was insufficient as a matter of law to support his conviction. The standards to be applied in reviewing the sufficiency of circumstantial evidence of guilt have been identified as follows:

* * * a conviction may be sustained when all the circumstances are consistent with guilt and, on the whole, inconsistent with any reasonable hypothesis of innocence. [Citations omitted.] The responsibility of this court is to determine whether the evidence, direct and circumstantial, viewed most favorably to support a finding of guilty, was sufficient to permit a jury to reach that conclusion.

State v. Bergland, 290 Minn. 249, 253, 187 N.W.2d 622, 625 (1971). "If the jury, giving due regard to the presumption of innocence and to the state's burden of proving the

2. At the suggestion of defense counsel that Robbie's father may have been her assailant, the state introduced results of tests run on a saliva specimen from Mr. Ward. This speci-

men was obtained under non-sterile conditions by a police officer who had never obtained one before. However, the tests indicated that Mr. Ward is not a nonsecretor.

defendant's guilt beyond a reasonable doubt, could reasonably have found the defendant guilty, that verdict will not be reversed." *State v. Merrill*, 274 N.W.2d 99, 111 (Minn.1978); *State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

█ The case is a troubling one because of the defendant's good reputation and because of the difficulty of proving a case of criminal sexual conduct in the absence of testimony from the complaining witness. A number of school officials testified to defendant's excellent reputation for honesty and trustworthiness and indicated that his responsibilities at the school required sensitive interpersonal skills. None of these individuals, however, had any first-hand knowledge about the events of January 5.

Much evidence supports the jury's finding. Defendant was present in the apartment both when Mrs. Ward arrived at 2:10 p. m. and when she telephoned at 3:10 p. m. He told Mrs. Ward before Robbie's statement that he had been in the basement apartment with Robbie, getting the end table. When Robbie spoke to her mother on the telephone at 3:10, she sounded so upset that Mrs. Ward called again in three or four minutes and calmed her incoherent daughter enough for Robbie to tell her mother, "Mr. Curtis put his thing in me and I hurt." The stain on the mattress cover in the basement apartment was damp when the police arrived, and proved, on testing, to be seminal fluid of a type secreted by twenty percent of the population, including defendant. Medical testimony indicated that Robbie had indeed been sexually assaulted and that penetration had occurred. Additionally, defendant stated to police officers that he had not touched Robbie Ward before he had been told the name of the complainant.

To counter that testimony, defendant introduced evidence that Robbie Ward was incapable of accurately reporting events when she was upset or excited. Cynthia K. Jones, who had known Robbie for two years and was her teacher, testified that Robbie is easily led and confused by peers and adults, and that, when excited, Robbie was usually unable to identify any of the parties about whom she was speaking by name.

Elaine Kienitz, another of Robbie's teachers, testified that Robbie would tell the truth when she knew the truth but was easily led and confused. Susan Lund, a clinical psychologist who testified on behalf of the prosecution regarding some tests she had performed on Robbie, indicated that Robbie "has difficulty integrating and sequencing things," but that she has a fair amount of "common sense skills."

Defendant testified that Robbie was already upset when he first came to her apartment to use the telephone and when her mother came home after 2:10 p. m. It is his contention that sometime before his arrival, or during the period of time between 2:10 p. m. and approximately 3:15 p. m., when he was with Robbie and in and out of the apartment, there was also the opportunity for some other person to have come in off the street and assault Robbie sexually. It is true that Mrs. Ward was so upset herself when she arrived at 2:10 p. m. that she might not have noticed had Robbie been upset at that time. However, the evidence, viewed in the light most favorable to the guilty verdict, indicates that the assault occurred after that time and before Mrs. Ward telephoned an hour later and found Robbie crying and babbling incoherently.

Finally, the jury could have drawn a negative inference from defendant's denial to the policemen at the time of his arrest, in which he used Robbie Ward's name before policemen had mentioned it. Defendant argues that the arresting officers charged him with "criminal sexual conduct with a minor," and that Robbie Ward was the only minor he had spent time with on January 5. Officer Bernstrom did not testify as to the exact wording of the charge at trial. His testimony at the omnibus hearing that it was not until defendant had been advised that the charge was criminal sexual conduct with a minor that he denied having touched Robbie Ward was not used by defendant for impeachment. After three hours of deliberation, the jury returned and asked the court

to repeat the specific wording of the charge as it was stated to Mr. Curtis. Only Officer Bernstrom's trial testimony was read. Defense counsel did not object. Viewing the evidence, as we must, in the light most favorable to the state, we find that the circumstances presented by this case are consistent with guilt and inconsistent, on the whole, with any reasonable hypothesis of innocence.

2. Defendant next contends that the prosecutor's closing argument was so prejudicial and misleading that it deprived him of a fair trial.

■ First, he argues that the state collaterally attacked the trial court's ruling that Robbie Ward was incompetent to testify when the prosecutor argued, "Is Robbie capable of fabrication? * * * No." However, Robbie Ward's capability of fabricating events was not specifically addressed during the trial. Testimony regarding her mental capacities, rather, focused on Robbie's ability to correctly report events which did, in fact, happen. It is unlikely that such a brief comment by the prosecutor could have had a profound impact on the jury's understanding of that ability.

■ Second, defendant argues that by commenting that defendant's witnesses knew him only professionally, the prosecutor indirectly attacked defendant's choice of witnesses. In *State v. Davis*, 305 Minn. 539, 233 N.W.2d 561 (1975), the prosecutor in a marijuana possession trial suggested that defendant's witnesses might be biased or untruthful because defendant was supplying them with marijuana. In the instant case, however, the prosecutor made no such unfounded suggestion; he stated, in fact, "If you recollect these witnesses—and I'm not saying anything about whether they were being truthful to you, I'm—they all were. They were telling you what they know." Thus, the prosecutor made no suggestion that defendant's witnesses were subject to any illegitimate bias; he merely suggested that they had little to add to the jury's understanding of what occurred on January 5. The court, furthermore, corrected any indication that character evidence presented by the defendant was unimportant by its instruction:

Good character, when proved, is a fact in the case that may tend, in a greater or less degree, to establish innocence; and it is not to be put to one side by the jury in order first to ascertain whether the other evidence, considered by itself, does not establish guilt beyond a reasonable doubt.

■ Third, the defendant argues that the prosecutor injected his personal opinion about the facts during his closing argument by using expressions like "I think * * *" and "I don't think * * *," followed by reference to evidence on an issue or an inference that could have been drawn from the evidence. Although such statements are not proper, in the instant case, as in *State v. Prettyman*, 293 Minn. 493, 198 N.W.2d 156 (1972), the frequency (the prosecutor used such expressions only four times during the course of a long argument) and context (his expressions were followed by permissible inferences) of these statements suggests "that they were perhaps more idle cliche than deliberate expression of personal opinion, and the absence of objection by the defense counsel who actually heard them adds to this impression." 293 Minn. at 495, 198 N.W.2d at 158.

■ Finally, the defendant notes a long passage in which the prosecutor suggested that, by introducing evidence of his good character, defendant sought to dissuade the jury from their legal responsibility and "[a]cquit me because I'm a nice guy." Again, the court's instruction regarding the importance of character evidence may well have cured the impression made by the prosecutor; however, it is wholly improper for the prosecutor to suggest that defendant's introduction of good character evidence was not a legitimate defense.

Nevertheless, defendant failed to object promptly to any of these statements or expressions by the prosecutor or to seek a corrective charge. *See State v. Hanson*, 289 Minn. 103, 107, 182 N.W.2d 706, 709 (1971). The prosecutor's remarks did not, on the whole, deprive defendant of a fair trial.

3. Defendant's final argument is that the trial court erred in failing to instruct the jury on the lesser offense of criminal sexual conduct in the fourth degree, Minn.Stat. § 609.345 (1978). A conviction of the lesser offense calls for a showing of contact short of penetration. Because the evidence does not reasonably support a finding that penetration did not occur, the submission of instruction on the lesser offense of fourth degree criminal sexual conduct was not mandated. *State v. Merrill*, 274 N.W.2d 99, 105 (Minn.1978). Further, defendant waived his right to such an instruction by his failure to request it. *See State v. Jordan*, 272 Minn. 84, 86, 136 N.W.2d 601, 604 (1965).

Affirmed.