**STATE of Minnesota, Respondent,**

**v.**

**Tylar James HOKANSON, Appellant.**

**Nos. A11–0359, A11–2227.**

Supreme Court of Minnesota.

Oct. 3, 2012.

Lori Swanson, Attorney General, Saint Paul, MN; and James C. Backstrom, Dakota County Attorney, Heather D. Pipenhagen, Assistant Dakota County Attorney, Cheri A. Townsend, Special Staff Assistant Dakota County Attorney, Hastings, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Saint Paul, MN, for appellant.

## OPINION

ANDERSON, G. BARRY, Justice.

Appellant Tylar James Hokanson was found guilty by a jury of first-degree murder while committing malicious punishment of a child with a past pattern of child abuse for the death of his stepson, 17–month–old Nicholas Arthur Miller. In this consolidated appeal, appellant argues that he is entitled to relief because: (1) his right to present an alternative perpetrator defense was violated when the district court denied defense counsel unfettered access to documents protected by the Minnesota Government Data Practices Act or other legislation; (2) his right to present an alternative perpetrator defense was violated when the district court ruled that potential reverse-*Spreigl* evidence was inadmissible; (3) the circumstantial evidence against him was insufficient as a matter of law to prove that he engaged in a "past pattern of child abuse"; (4) the jury instructions given relieved the State of its burden to prove beyond a reasonable doubt that he had engaged in a "past pattern of child abuse"; and (5) his defense counsel engaged in ineffective assistance of counsel by failing to object to the erroneous jury instructions. Because we conclude that his claims lack merit, we affirm appellant's conviction.

At 5:29 p.m. on Tuesday, June 23, 2009, the Pierce County, Wisconsin, sheriff's department received a 911 call from appellant requesting an ambulance because his stepson, Nicholas Arthur Miller, was having difficulty breathing. Appellant further reported that CPR was being performed on Nicholas. Paramedics arrived at the rural farmhouse in Maiden Rock, Wisconsin, where appellant was staying with Nicholas, his wife and Nicholas's mother M.H., his stepdaughter M.M., and his infant son N.H., while visiting several other family members. The paramedics who

placed Nicholas into the ambulance detected no heartbeat and were unable to resuscitate him. After transporting him to a hospital in Durand, Wisconsin, Nicholas was pronounced dead.

The Pierce County Medical Examiner ordered an autopsy that was performed by a forensic pathologist in Ramsey County. The preliminary autopsy report listed Nicholas's cause of death as a result of multiple blunt-force injuries and classified the death as a homicide. The autopsy report documented multiple injuries occurring over a period of time, including: bruising and abrasion on Nicholas's left eye; a contusion on the forehead; bruising on the right eyelid, right cheek, and left side of the jaw consistent with fingertips; bruising on the chest and shoulders; bruising on the back of the neck; and bruising in the center of the back. The autopsy also documented lacerations to the mouth and tongue, multiple rib fractures, and a fracture of a thoracic vertebra in the child's back. Based on iron studies of the contusions, the pathologist testified that the contusions likely occurred within a spectrum of days leading up to Nicholas's death. The examination also documented a subdural hematoma with approximately 20 cubic centimeters of blood pooled in the brain, which the pathologist testified was likely from an injury sustained 2 to 5 days before Nicholas's death.

Because police believed that, based on the autopsy, the injuries that caused Nicholas's death were inflicted a few days before he died, the investigation was transferred to Dakota County, where Nicholas had resided in a rural farmhouse with several family members. In the days following Nicholas's death, Dakota County law enforcement officers met and interviewed several people, including appellant, who lived with Nicholas and was Nicholas's stepfather; M.H., Nicholas's mother and appellant's wife; and several other family members, including B.M., Nicholas's biological father and an initial suspect in the homicide.

During the police interview with appellant, appellant admitted that he had shaken Nicholas in the days leading up to his death. Appellant said that he had shaken Nicholas back and forth "no less than 10, no less than 15" times, and rated the level of force used at a 5 or 6 out of 10. When asked whether it was possible that he had shaken Nicholas harder than that, appellant responded "possibly." Appellant also admitted to covering Nicholas's mouth with his hand to stop him from screaming and to holding Nicholas's face down while Nicholas called for his mother. Appellant further stated that he believed that his actions contributed to Nicholas's health problems in the days leading up to his death, and acknowledged that he thought the shaking could have caused the bleeding on Nicholas's brain.

A grand jury subsequently indicted appellant with six counts of murder: (1) first-degree murder while committing child abuse (assault in the third degree), under Minn.Stat. § 609.185(a)(5) (2010), and Minn.Stat. § 609.223, subd. 3 (2010); (2) first-degree murder while committing child abuse (malicious punishment of a child) with a past pattern of child abuse, under Minn.Stat. § 609.185(a)(5) and Minn.Stat. § 609.377, subds. 1, 4 (2010); (3) first-degree murder while committing child abuse (neglect of a child), under Minn.Stat. § 609.185(a)(5) and Minn.Stat. § 609.378, subd. 1(a)(1) (2010); (4) second-degree murder while committing a felony (assault in the third degree), under Minn.Stat. § 609.19, subd. 2(1) (2010) and Minn.Stat. § 609.223, subd. 3; and (5) second-degree murder while committing a felony (malicious punishment of a child), under Minn. Stat. § 609.19, subd. 2(1) and Minn.Stat.

§ 609.377, subds. 1, 4; and (6) second-degree murder while committing a (felony-neglect of a child), under Minn.Stat. § 609.19, subd. 2(1) and Minn.Stat. § 609.378, subd. 1(a)(1).

Before trial, appellant filed a notice of motion and motion seeking an order granting him access to the entire child protection file relating to investigations of M.H. and B.M. by social services. Appellant argued that other family members, including both of Nicholas's biological parents, had at least as much access to Nicholas leading up to his death and that appellant should be allowed to use evidence of social services' investigations into parenting by M.H. and B.M. as part of his defense. The State responded that the information requested was privileged under the child protection statutes and the Minnesota Government Data Practices Act, and that disclosure was not appropriate without an *in camera* review and a court order pursuant to *State v. Paradee,* 403 N.W.2d 640 (Minn.1987). The district court then ordered an *in camera* review of the social services files in question to determine which portions would be given to appellant. The district court then released documents under seal to appellant that it determined to be "potentially relevant."

At appellant's omnibus hearing, appellant requested that additional social services and child protection files be released and questioned the child protection worker who was in charge of the investigations relating to Nicholas after his death. As a result of this request, the district court reviewed notes and files related to the child protection worker's participation in the case and released additional documents to the defense. The district court also released additional social services documents on multiple occasions in the months leading up to trial.

Before trial, the State filed a motion in limine to exclude evidence, including testimony that B.M. had previously shaken M.M., Nicholas's older sister and B.M.'s daughter; evidence regarding the parenting skills of M.H. and B.M., Nicholas's biological parents; evidence about custody arrangements or child protection proceedings for M.H.'s and B.M.'s other children; and evidence that M.H.'s father had physically disciplined M.H. while M.H. was a teenager, as irrelevant and inadmissible character evidence. After a hearing, the district court issued an order ruling inadmissible: (1) evidence or testimony related to the parenting skills of any party; and (2) any reference to the Children in Need of Protection (CHIPS) file or custody arrangements for the other children unless approved by the court. The district court also ruled that evidence that M.H.'s father had previously disciplined her as a teenager was irrelevant and inadmissible, and that appellant had not sufficiently articulated the specific acts committed by M.H. that were relevant and thus admissible as alternative perpetrator evidence.

Appellant submitted a motion to reconsider and argued that evidence of M.H.'s father's disciplinary history was proper alternative perpetrator evidence that established the father as an alternate abuser of Nicholas. Appellant also argued that a specific incident that occurred on August 11, 2009, in which M.M. burned her arm while M.H. and M.M. were making pancakes, was properly admissible as alternative perpetrator evidence because it implicated M.H. as an alternative abuser of M.H.'s children. Specifically, appellant argued that both the incident itself (in which M.M. sustained a burn that "could only have happened if someone had laid [M.M.]'s arm across the griddle") and M.H.'s failure to report the incident or take the child to the doctor indicated that M.H. was abusing M.M. The district court

issued an order prohibiting evidence that M.H.'s father physically disciplined M.H. as irrelevant and as inadmissible character evidence, but allowed a hearing to consider testimony related to the burn incident. After a hearing during appellant's trial, the district court ruled that evidence relating to M.M.'s burn was inadmissible because there was not clear and convincing evidence that the burns had been sustained as a result of abuse.

At trial, the State called as witnesses the officers at the scene and medical experts, including a medical expert who testified that Nicholas's injuries were consistent with abuse. The State argued that appellant admitted to shaking Nicholas days before his death, that appellant knew that such injuries were contributing to Nicholas's sickness and lethargy in the days leading up to his death, that appellant failed to get medical care for Nicholas, and that appellant's actions led to Nicholas's death. The State also called witnesses, mostly family and friends of appellant and M.H., who saw Nicholas interacting with appellant and, in some cases, saw appellant abuse Nicholas. Finally, the State called two inmates who were in jail with appellant and who testified that appellant had admitted to them that he had abused Nicholas.

Appellant presented no witnesses and did not testify on his own behalf, but argued that the State had failed to prove that the injuries sustained by Nicholas were either caused by appellant or led to Nicholas's death. Appellant further argued that other family members, including M.H. and B.M., could have abused Nicholas, and that their actions in failing to get medical care could have led to his death. Appellant also argued that the witnesses presented by the State, especially the two jail inmates, were not credible.

The jury acquitted appellant of Count I, first-degree murder while committing child abuse (third-degree assault) with a past pattern of child abuse, Minn.Stat. § 609.185(a)(5); and Count IV, second-degree murder while committing a felony (third-degree assault), Minn.Stat. § 609.19, subd. (2)(1). But the jury found appellant guilty of Count II, first-degree murder while committing child abuse (malicious punishment of a child) with a past pattern of child abuse, Minn.Stat. § 609.185(a)(5); Count III, first-degree murder while committing child abuse (neglect of a child) with a past pattern of child abuse, Minn.Stat. § 609.185(a)(5); Count V, second-degree murder while committing a felony (malicious punishment of a child), Minn.Stat. § 609.19, subd. (2)(1); and Count VI, second-degree murder while committing a felony (neglect of a child), Minn.Stat. § 609.19, subd. (2)(1). The district court subsequently sentenced appellant on Count II to a life sentence with the possibility of parole after 30 years.

Appellant then filed this direct appeal. After the filing of the direct appeal, we granted appellant's motion to stay the direct appeal to allow postconviction proceedings to take place first. In his petition for postconviction relief, appellant argued that the jury instructions given were plainly erroneous and that his counsel was ineffective for failing to object to the erroneous jury instructions. The postconviction court denied his request for relief without holding an evidentiary hearing, and we lifted the stay and consolidated appellant's direct appeal with his appeal from the denial of postconviction relief.

I.

Appellant first argues that the district court denied him his constitutional right to present an alternative perpetrator

defense by denying defense counsel unfettered access to social services files of Nicholas's other family members. Specifically, appellant argues that the district court should have allowed defense counsel to review all records without conducting an *in camera* review, and that the district court's failure to do so entitles appellant to a new trial if our court finds that the files contained other possible reverse-*Spreigl* evidence.

■ Criminal defendants have a broad right to discovery in order to prepare and present a defense. *State v. Paradee,* 403 N.W.2d 640, 642 (Minn.1987). Minnesota Rule of Criminal Procedure 9.01, subd. 2(1), governs discretionary disclosure in felony and gross misdemeanor cases. As relevant here, the rule states:

> On the defendant's motion, the court for good cause must require the prosecutor ... to assist the defendant in seeking access to specified matters relating to the case that are within the possession or control of an official or employee of any governmental agency, but not within the prosecutor's control.

Minn. R.Crim. P. 9.01, subd. 2(1). But previous versions of the comments to the rule, although not binding, properly indicate that subdivision 2(1) "does not allow a defendant access to materials ... that are protected by the Minnesota government data practices act in Minn.Stat. ch. 13 or by other legislation." Minn. R.Crim. P. 9.01, subd. 2, cmt. (2009). All of the records sought by appellant are protected by the Minnesota Government Data Practices Act or by other legislation: child protection records are protected by Minn.Stat. § 260C.171 (2010) and Minn.Stat. § 13.46, subd. 2 (2010), and records of psychological treatment and counseling are protected by Minn.Stat. § 13.46, subd. 7 (2010) and Minn.Stat. § 13.822 (2010).

■ When a criminal defendant requests records that are subject to the Minnesota Government Data Practices Act or other legislation, the district court may screen the confidential records *in camera* to balance the right of the defendant to prepare and present a defense against the rights of victims and witnesses to privacy. *Paradee,* 403 N.W.2d at 642. This *in camera* review is not a right, however, and the defendant must first establish a " 'plausible showing' that the information sought would be 'both material and favorable to his defense.' " *State v. Hummel,* 483 N.W.2d 68, 72 (Minn.1992) (quoting *Pennsylvania v. Ritchie,* 480 U.S. 39, 58 n. 15, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987)). On appeal, we review the limits placed by the district court on the release and use of protected records for an abuse of discretion. *State v. Evans,* 756 N.W.2d 854, 872–73 (Minn.2008).

■ Here, the district court clearly followed the *Paradee* process and reviewed all social services records *in camera.* As a result of that review, the district court disclosed relevant portions of the requested files on six separate occasions before trial. Appellant's claim that he should be entitled to review all records with a "defense counsel's" eye is clearly inconsistent with *Paradee.* In *Paradee,* we rejected an identical argument, explaining that:

> We believe that the in camera approach of these cases is superior to the approach taken by [previous courts], an approach which in effect allows defense counsel easy access to various types of privileged and confidential records simply by asserting that the records might contain material relevant to the defense. The in camera approach strikes a fairer balance between the interest of the privilege holder in having his confidences kept and the interest of the criminal defendant in obtaining all relevant evi-

dence that might help in his defense. We believe that trial courts, who by training and experience are qualified for the task of determining matters of relevancy, are capable of determining what if any of the information in the records might help in the defense.

403 N.W.2d at 642. Appellant does not question the *Paradee* framework, suggest that the records at issue are not legislatively protected, or argue that *Paradee* itself should be overturned. And we are " 'extremely reluctant to overrule our precedent under principles of *stare decisis* ' [and] require a 'compelling reason' before a prior decision will be overruled." *Daly v. McFarland*, 812 N.W.2d 113, 121 (Minn. 2012) (quoting *State v. Martin*, 773 N.W.2d 89, 98 (Minn.2009)). Thus, the relevant question is whether the district court abused its discretion in either failing to disclose some records requested by appellant or in not allowing such records to be used at trial.

Having reviewed all of the confidential social services documents in the record, we conclude that the district court did not abuse its discretion in limiting access to the social services records. The court performed an exemplary and thorough examination of the records, and if anything provided more information to appellant than required. We have reviewed the specific documents at issue and are satisfied that all of the documents that were not disclosed are copies of documents already disclosed to appellant or are otherwise duplicative; background checks and records of persons who were not identified as alternative perpetrators; or documents that are either irrelevant or that appellant would have access to through other means (copies of the complaint, for example). We therefore conclude that the district court did not abuse its discretion in deciding to disclose some documents but not others to appellant.

## II.

Appellant next argues that he was denied his constitutional right to present a complete defense—specifically his right to present evidence that an alternative perpetrator committed the crime for which he was charged. Appellant argues that the district court erred by limiting his ability to present reverse-*Spreigl* evidence alleging that M.H. or another family member caused Nicholas's death, and that this error was not harmless beyond a reasonable doubt. Appellant claims that the court was obligated to admit all potential alternative perpetrator evidence that could possibly show that an alternative perpetrator could have caused Nicholas's death.

 District courts have discretion in ruling on evidentiary matters, and will not be reversed absent a clear abuse of discretion. *State v. Atkinson*, 774 N.W.2d 584, 589 (Minn.2009). If an appellate court concludes that the district court abused its discretion in excluding alternative perpetrator evidence, the appellate court must then determine whether the error was harmless beyond a reasonable doubt. *Id.* An error is harmless beyond a reasonable doubt if the verdict rendered is " 'surely unattributable' " to the error. *Id.* (quoting *State v. King*, 622 N.W.2d 800, 809 (Minn. 2001)).

 Criminal defendants have a right to prepare and present a complete defense. *State v. Larson*, 787 N.W.2d 592, 597 (Minn.2010). This right includes " 'the right to present evidence showing that an alternative perpetrator committed the crime with which the defendant is charged.' " *Id.* (quoting *Atkinson*, 774 N.W.2d at 589). Such evidence is admitted " 'to create a reasonable doubt as to the defendant's guilt' " rather than " 'for the purpose of establishing the alternative

perpetrator's guilt.'" *Id.* (quoting *Atkinson,* 774 N.W.2d at 590). In determining the admissibility of alternative perpetrator evidence, the district court follows a two-step process. First, the defendant must lay "a proper foundation for admission of such evidence by offering evidence that has an inherent tendency to connect the alternative perpetrator to the commission of the charged crime." *Atkinson,* 774 N.W.2d at 590. Without a proper foundation, the alternative perpetrator evidence is not admissible. *Id.* "If the defendant lays a proper foundation, he may then introduce 'evidence of a motive of the third person to commit the crime, threats by the third person, or other miscellaneous facts' tending to prove" the alternative perpetrator's guilt. *Id.* (quoting *State v. Hawkins,* 260 N.W.2d 150, 159 (Minn.1977)). But evidence introduced as exculpatory based on an alternative perpetrator theory must still be admissible "under the ordinary evidentiary rules as ... would any other exculpatory evidence." *State v. Jones,* 678 N.W.2d 1, 16 (Minn.2004).

As part of the alternative perpetrator evidence presented, a defendant may "present evidence of other crimes, wrongs, or bad acts committed by the alleged alternative perpetrator in order to cast reasonable doubt upon the identification of the defendant as the person who committed the charged crime." *Id.* This evidence is often referred to as "reverse-*Spreigl*" evidence. *Woodruff v. State,* 608 N.W.2d 881, 885 (Minn.2000). Before introducing reverse-*Spreigl* evidence, the defendant must show: "(1) by clear and convincing evidence that the third party participated in the reverse-*Spreigl* incident; (2) that the reverse-*Spreigl* incident is relevant and material to defendant's case; and (3) that the probative value of the reverse-*Spreigl* evidence

outweighs its potential for unfair prejudice." *Id.*

Appellant argues that the district court improperly excluded alternative perpetrator evidence relating to M.H., M.H.'s father, and other family members who may have abused Nicholas. These alternative perpetrators are discussed in turn.

*M.H.*

Appellant argues that he should have been permitted to introduce evidence of M.H.'s poor parenting, CHIPS proceedings in which she was involved, her mental illness diagnosis, and the incident involving M.M. being burned as evidence showing that M.H. was an alternative perpetrator. The district court ruled that evidence of "bad parenting practices" without articulated, specific incidents was inadmissible as reverse-*Spreigl* evidence. After a hearing, the district court also ruled that evidence about the burn sustained by M.M. was inadmissible as reverse-*Spreigl* evidence because there was not "clear and convincing evidence" that the events leading up to M.M.'s burn were caused by abuse.

We conclude that the district court did not abuse its discretion in ruling inadmissible evidence that M.H. was an alternative perpetrator. First, this evidence does not have an "inherent tendency" to connect M.H. with the death of Nicholas. Second, evidence relating to poor parenting, CHIPS proceedings, and a mental illness diagnosis are not specific crimes, wrongs, or bad acts that typically fall within the parameters of reverse-*Spreigl* evidence. Even the findings that M.H. had neglected her other children does not necessarily indicate that abuse occurred. Third, such evidence violates the third reverse-*Spreigl* requirement that the evidence be more probative than prejudicial; the defense basically sought to label

M.H. as a bad parent in order to imply that she murdered Nicholas.

■ As to the evidence of a burn sustained by M.M., this evidence could have met the foundational requirements for alternative perpetrator evidence if the burn had been sustained as a result of abuse, because it would have indicated that M.H. had abused at least one of her children, albeit in an incident that occurred after Nicholas died. In addition, we note that the district court allowed appellant to fully explore the facts of the underlying event before concluding that appellant had failed to meet the second prong of the reverse-*Spreigl* test by failing to establish that the burn resulted from abuse. None of the witnesses supported appellant's theory that the child was injured by M.H.'s intentional act, as appellant now alleges. M.H. and other witnesses testified that the burn was an accident, and mere inconsistencies in their testimony, without more, is insufficient to say that the district court erred in its ruling. The credibility of witnesses is within the province of the fact finder, and the district court did not abuse its discretion in rejecting the burn evidence as reverse-*Spreigl* evidence.

### M.H.'s father

■ Appellant argues that he should have been permitted to introduce evidence that M.H.'s father had physically disciplined M.H. as a teenager to show that he was given to excessive discipline and was thus an alternative perpetrator of Nicholas's death. The district court ruled that evidence regarding M.H.'s father's alleged physical abuse of M.H. was inadmissible because it was irrelevant, as "there is no logical connection between an act of physical discipline or violence against a teenager and an act of alleged brutality against a 17-month-old child."

We conclude that the district court did not abuse its discretion in excluding this evidence. Appellant wholly fails to connect M.H.'s father with the charged crime. M.H.'s father's mere presence with Nicholas in the days prior to Nicholas's death does not have an "inherent tendency to connect" M.H.'s father with Nicholas's death. We have previously ruled that "[m]ere presence at the scene of the crime does not, by itself, create an inherent tendency to connect a person alleged to be the alternative perpetrator to the commission of the charged crime." *Atkinson,* 774 N.W.2d at 590. More importantly, we cannot say that the district court abused its discretion in concluding that the evidence was inadmissible because there was "no logical connection" between M.H.'s father's abuse of M.H. and Nicholas's death.

### Other family members

Finally, appellant suggests that he should have been permitted to introduce evidence that other family members had access to Nicholas and could have been responsible for his death. While appellant claims, and respondent does not dispute, that other family members were generally around Nicholas in the days leading up to his death, appellant offers no proof that any other family member abused Nicholas.

To the extent that appellant argues that records that were not disclosed through the *in camera* process could have provided adequate foundation for the argument that another family member was responsible for abusing Nicholas in a manner that led to his death, we have previously rejected that argument. No undisclosed records support this conclusion or provide a foundation that would establish an "inherent tendency to connect" any other family member "to the commission of the charged crime." *Atkinson,* 774 N.W.2d at 590.

■ But even if the district court erred in failing to admit evidence relating to

other family members, the error was harmless beyond a reasonable doubt. When evidence is erroneously excluded in violation of a defendant's right to present a complete defense, we consider whether, assuming that the damaging potential of the excluded evidence was fully realized, the erroneous exclusion of evidence was harmless beyond a reasonable doubt. *State v. Jones,* 753 N.W.2d 677, 695 (Minn. 2008). At most, the excluded evidence establishes that other family members were neglectful, were poor parents, or otherwise failed Nicholas in his short and tragic life. None of the evidence connects M.H., M.H.'s father, or any other family member to Nicholas's death. Thus, even assuming that the damaging potential of that evidence was fully realized, any error was harmless beyond a reasonable doubt.

### III.

Next, appellant asserts that the State presented insufficient evidence to prove a past pattern of child abuse because the State failed to prove that the alleged acts were committed by appellant and because none of his alleged conduct constituted child abuse. Based on that assertion, petitioner argues that his conviction of first-degree murder while committing child abuse with a past pattern of child abuse must be reversed. We disagree.

The definition of "child abuse" set forth in the first-degree murder statute (Minn. Stat. § 609.185(b) (2010)), includes an act committed against a minor victim in violation of the malicious punishment statute, Minn.Stat. § 609.377 (2010). A person is guilty of malicious punishment of a child if,

as a parent, the person engages in an intentional act constituting "unreasonable force or cruel discipline that is excessive under the circumstances." Minn.Stat. § 609.377, subd. 1. Keeping these statutory provisions in mind, we review the evidence presented by the State at appellant's trial. Because the standard of review for a conviction based on direct evidence differs from the standard of review for a conviction based on circumstantial evidence, we first review the State's direct evidence and then consider the State's circumstantial evidence.

When a defendant claims that the State's direct evidence was insufficient to sustain a conviction, " 'we view the evidence in the light most favorable to the State and will assume that the jury believed the State's witnesses and disbelieved contrary evidence.' " [1] *State v. Hughes,* 749 N.W.2d 307, 312 (Minn.2008) (quoting *State v. Moore,* 481 N.W.2d 355, 360 (Minn.1992)). If the direct evidence, when so viewed, would permit the jury to reasonably conclude that the State has proven the fact in question beyond a reasonable doubt, the evidence is sufficient to sustain a criminal conviction. *Id.*

At trial, the State presented direct evidence that when Nicholas was 8 months old, appellant threw him onto a bed in a "harsh" manner. The boyfriend of B.M.'s mother told the jury that he personally witnessed this incident. When viewed in a light most favorable to the State, we conclude that the boyfriend's testimony permitted the jury to reasonably conclude that the State proved beyond a

---

**1.** "Direct evidence is that which proves a fact without an inference or presumption and which in itself, if true, establishes that fact." 1 Barbara E. Bergman & Nancy Hollander, *Whartons Criminal Evidence* § 1:8 (15th ed.1997) (internal quotation marks omitted). "For example, a witness's testimony is direct

evidence when it is based on the witness's own knowledge of the facts. *Id.* When a witness testifies that he saw the defendant shoot the victim or heard the defendant say the money was stolen, that testimony is direct evidence." *Id.*

reasonable doubt that appellant committed an intentional act of unreasonable force that was excessive under the circumstances when he threw 8–month–old Nicholas on a bed in a "harsh" manner.

 A single act of malicious punishment of a child, however, is insufficient to prove the pattern-of-child-abuse element of first-degree murder under Minn. Stat. § 609.185(a)(5). *State v. Johnson,* 773 N.W.2d 81, 86 (Minn.2009). In *Johnson,* we explained that although the State may prove a pattern beyond a reasonable doubt "even if the State does not prove every claimed predicate act of the pattern beyond a reasonable doubt," at least two instances must be proven beyond a reasonable doubt to constitute a pattern.[2] *Id.* at 86–87. Consequently, we must consider the other incidents of malicious punishment alleged by the State. Because the State attempted to prove the other incidents of malicious punishment based solely on circumstantial evidence, our review of those incidents is controlled by the two-step test set forth in *State v. Andersen,* 784 N.W.2d 320, 329–30 (Minn.2010).[3]

 Under the *Andersen* test, we must first identify the circumstances proved, and in doing so, we will "defer to the fact-finder's acceptance of the proof of these circumstances and the fact-finder's rejection of evidence in the record that conflicts with the circumstances proved by the State." *State v. Matthews,* 800 N.W.2d 629, 635 (Minn.2011) (citing *Andersen,* 784 N.W.2d at 329). "The phrase 'circumstances proved' does not mean 'every circumstance as to which there may be some testimony in the case'; rather, it refers only to those 'circumstances as the jury finds proved by the evidence.'" *State v. Tscheu,* 758 N.W.2d 849, 857–58 (Minn. 2008) (quoting *State v. Johnson,* 173 Minn. 543, 545, 217 N.W. 683, 684 (1928)).

 "Second, we examine independently the reasonable inferences that might be drawn from the circumstances proved. We give no deference to the fact-finder's choice between reasonable inferences." *Matthews,* 800 N.W.2d at 635 (citation omitted). Thus, to sustain a conviction based on circumstantial evidence, the reasonable inferences that can be drawn from the circumstances proved as a whole must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt. *Andersen,* 784 N.W.2d at 332 (citing *State v. Curtis,* 295 N.W.2d 253, 258 (Minn.1980)). This formulation does not require that "the State's evidence must exclude *all* inferences other than that of guilt. The State's obligation is to exclude all *reasonable* inferences other than guilt." *Tscheu,* 758 N.W.2d at 857. "We will not overturn a conviction based on circumstan-

---

2. Additionally, the acts proven must be sufficiently connected to each other to constitute a "'regular way of acting,'" and the acts must be sufficiently temporally proximate to one another. *Id.* (quoting *State v. Robinson,* 539 N.W.2d 231, 237 (Minn.1995)). However, appellant does not argue on appeal that the State failed to prove that the abuse alleged, if proven, would constitute "a regular way of acting" so as to constitute a pattern. *State v. Robinson,* 539 N.W.2d 231, 237 (Minn.1995); *see also State v. Clark,* 739 N.W.2d 412, 421 (Minn.2007).

3. "Circumstantial evidence is evidence from which the factfinder can infer whether the facts in dispute existed or did not exist." 1 Barbara E. Bergman & Nancy Hollander, *Whartons Criminal Evidence* § 1:8 (15th ed.1997). "The factfinder is permitted to draw this inference if a reasonable relationship exists between the known facts and circumstances and the facts sought to be proved." *Id.* "For example, if the defendant was the only one in the house when the victim died of a gunshot wound to the back, this would be circumstantial evidence that the defendant shot the victim." *Id.*

tial evidence on the basis of mere conjecture." *State v. Lahue*, 585 N.W.2d 785, 789 (Minn.1998).

■ Relying on circumstantial evidence, the State attempted to prove 12 additional incidents of malicious punishment committed by appellant against Nicholas and other family members.[4] Because the State was only required to prove two violations of the malicious punishment statute, there is no need for us to consider all 12 incidents of alleged malicious punishment. Instead, we conclude that the State presented sufficient circumstantial evidence that appellant committed malicious punishment against Nicholas when he was 10 and 12 months old.

The circumstances proved for those incidents are as follows. Nicholas sustained bruising on his face around 10 and 12 months of age. The facial bruising showed a pattern consistent with fingertips. Nicholas did not have any blood disorder or other medical problem that would have caused him to bruise easily. M.H. witnessed bruises on Nicholas's face, observed appellant putting his hand over Nicholas's mouth, and saw appellant squeeze Nicholas around the rib cage. Nicholas was afraid of appellant and would try to move away from him. Appellant admitted to putting his hands over Nicholas's mouth when he was crying, and would hold Nicholas's face down into the bed when Nicholas was screaming for his mother. Appellant also admitted to squeezing Nicholas's torso with his hands to get him to stop crying. Additionally, the individuals who had contact with Nicholas at the time in question testified that they never abused Nicholas, and we must assume that the jury believed their testimony. More specifically, M.H. testified that she never abused her children, and B.M.'s mother's boyfriend denied ever abusing, hitting, or putting his hand over Nicholas's mouth. M.H. also never saw B.M., B.M.'s mother, or B.M.'s mother's boyfriend abuse Nicholas.

Under the second step of the *Andersen* analysis, we must next consider whether the circumstances proved support a reasonable inference that appellant committed malicious punishment of a child against Nicholas when he was 10 and 12 months old. *Andersen*, 784 N.W.2d at 329. Appellant admitted putting his hands over Nicholas's mouth and holding Nicholas's face down on the bed while Nicholas screamed. Although appellant did not admit that his actions bruised Nicholas, the circumstances proved in this case support a reasonable inference that appellant put his hand over Nicholas's mouth and held Nicholas face down on a bed with such force that it caused bruising. Consequent-

---

4. The twelve incidents of alleged malicious punishment were as follows: (1) at age 10 months Nicholas sustained bruising on his face; (2) at age 12 months Nicholas again sustained bruising on his face; (3) on another occasion Nicholas sustained fingertip-shaped bruises on his back; (4) in January 2009 Nicholas fractured his clavicle while in appellant's care; (5) in March 2009 Nicholas suffered a black eye; (6) in May 2009 Nicholas again fractured his clavicle and sustained facial bruises while in appellant's care; (7) on another occasion Nicholas was found with dried blood on his face after appellant stated that Nicholas fell; (8) appellant squeezed Nicholas to stop him from screaming and Nicholas was later diagnosed with 5 posterior rib fractures, which were consistent with squeezing; (9) on another occasion appellant pushed Nicholas "accidentally" after being told by appellant's daughter, H.S., to stop being mean; (10) on another occasion Nicholas sustained multiple metaphyseal fractures consistent with pulling or jerking motions; (11) during the same time period as appellant's admitted shaking of Nicholas, another infant child of appellant's, N.H., sustained a rib fracture; and (12) an occasion in which appellant threw M.M. on a bed when she threw a tantrum after a bath.

ly, a reasonable jury could have concluded that appellant's actions involved "unreasonable force or cruel discipline that is excessive under the circumstances," and therefore constituted a violation of the malicious punishment statute.

Next, we consider whether the circumstances proved also support a rational hypothesis other than guilt. *Andersen*, 784 N.W.2d at 329. More precisely, do the circumstances proved support a rational hypothesis that appellant did not commit malicious punishment against Nicholas when he was 10 and 12 months old? We conclude that they do not. Assuming, as we must, that the jury believed the other individuals who had contact with Nicholas when they denied abusing Nicholas when he was 10 and 12 months old, the jury could not have reasonably concluded that someone other than appellant inflicted the bruises. Similarly, if the jury believed the medical examiner's testimony that Nicholas did not bruise easily, the jury could not have reasonably concluded that appellant used reasonable force when he covered Nicholas's mouth and held Nicholas down on the bed. We therefore conclude that the State presented sufficient evidence to prove the element of a past pattern of child abuse beyond a reasonable doubt.

## IV.

Appellant next argues that the district court plainly erred because the jury instructions given on the element of a "past pattern of child abuse" relieved the State of its burden to prove the element beyond a reasonable doubt.

 Unobjected-to jury instructions are reviewed for plain error. *State v. Laine*, 715 N.W.2d 425, 432 (Minn.2006). Under a plain error analysis, appellant must show that (1) there was error; (2) that was plain; and (3) his substantial

rights were affected. *State v. Griller*, 583 N.W.2d 736, 740 (Minn.1998). An error is plain if it "contravenes case law, a rule, or a standard of conduct." *State v. Ramey*, 721 N.W.2d 294, 302 (Minn.2006). "If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings." *Griller*, 583 N.W.2d at 740. The defendant has the burden of proof on the third element of the test, and it is considered a " 'heavy burden.' " *Ramey*, 721 N.W.2d at 302 (quoting *Griller*, 583 N.W.2d at 741).

 Additionally, district courts have latitude in choosing jury instructions. *State v. Baird*, 654 N.W.2d 105, 113 (Minn. 2002). "The district court has broad discretion in determining jury instructions, and we will not reverse where jury instructions 'overall fairly and correctly state the applicable law.' " *Stewart v. Koenig*, 783 N.W.2d 164, 166 (Minn.2010) (quoting *Hilligoss v. Cargill, Inc.*, 649 N.W.2d 142, 147 (Minn.2002)).

Here, the district court read the following jury instruction on the issue of a "past pattern of child abuse":

> Fourth, the defendant engaged in a past pattern of child abuse upon Nicholas Arthur Miller, [M.M.], or [N.H.]. A past pattern consists of prior acts of child abuse, which form a reliable sample of observable traits or acts, which characterize an individual's behavior. More than one prior act of child abuse by the defendant is required for there to be a past pattern. . . . If you find that each of these elements has been proven beyond a reasonable doubt, the defendant is guilty. If you find that any element has not been proven beyond a reasonable doubt, the defendant is not guilty.

Appellant argues that the instruction given was plainly erroneous because it did

not clearly state that at least two separate incidents of child abuse that make up the past pattern of child abuse must be proven by the State beyond a reasonable doubt. We disagree.

When viewed as a whole, we conclude that the district court's jury instructions fairly and correctly state the applicable law. Nothing in the instructions suggest that a lesser standard of proof is applied to the requirement that the State prove more than one prior act of abuse for there to be a past pattern of child abuse. Instead, the court's instructions repeatedly and consistently informed the jury that the State's burden of proof was "beyond a reasonable doubt." [5] Thus, we conclude that the court did not err in its jury instruction on the element of a past pattern of child abuse.

## V.

Finally, appellant argues that his trial counsel was ineffective in failing to object to the jury instructions regarding the element of a past pattern of child abuse, and that the postconviction court erred in denying him an evidentiary hearing on his claim.

■■■■ Claims of ineffective assistance of counsel are reviewed de novo because they involve mixed questions of fact and law. *Dobbins v. State,* 788 N.W.2d 719, 728 (Minn.2010). A petitioner may use a postconviction proceeding to develop a record on claims of ineffective assistance of counsel if the trial record is insufficient. *Torres v. State,* 688 N.W.2d 569, 572 (Minn.2004). We review a summary denial of postconviction relief for an abuse of discretion. *Davis v. State,* 784 N.W.2d 387, 390 (Minn.2010). We review a postconviction court's legal conclusions de novo, and its factual findings for clear error. *Bonga v. State,* 797 N.W.2d 712, 718 (Minn.2011). Appellant has the burden of alleging facts that, if proven, entitle him to relief, and a petition may be denied if the petitioner's allegations are no more than " 'argumentative assertions without factual support.' " *Davis,* 784 N.W.2d at 392 (quoting *Hodgson v. State,* 540 N.W.2d 515, 517 (Minn.1995)).

■■■■ The United States and Minnesota Constitutions guarantee a criminal defendant the right to effective assistance of counsel. *See* U.S. Const. amend. VI; Minn. Const. art. I, § 6; *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Vance,* 254 N.W.2d 353, 358 (Minn.1977). "[T]he [right to counsel] guarantees criminal defendants only a fair trial and a competent attorney. It does not insure that defense counsel will recognize and raise every conceivable constitutional claim." *Engle v. Isaac,* 456 U.S. 107, 134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). To prevail on an ineffective assistance of counsel claim, appellant must show that his trial counsel's "representation fell below an objective standard of reasonableness and that there is a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Dobbins,* 788 N.W.2d at 728 (quoting *Opsahl v. State,* 677 N.W.2d 414, 420 (Minn.2004)); *Leake v. State,* 767 N.W.2d

---

5. Appellant's reliance on *State v. Mahkuk,* 736 N.W.2d 675, 682 (Minn.2007), is misplaced because unlike the alleged error in *Mahkuk,* the alleged error in this case does not involve the failure to instruct the jury on an element of the offense. Instead, the alleged error in this case involves the means used to establish an element of the offense. *See State v. Kelbel,*

648 N.W.2d 690, 699–702 (Minn.2002) (explaining that the element of the offense is the *pattern* of child abuse, not the incidents of abuse itself). It is undisputed that the district court expressly instructed the jury that the State had to prove a pattern of child abuse beyond a reasonable doubt.

5, 10 (Minn.2009) (outlining the test for ineffective assistance of counsel, based on *Strickland,* 466 U.S at 687–88, 104 S.Ct. 2052). The objective standard of reasonableness "is defined as representation by an attorney exercising the customary skills and diligence that a reasonably competent attorney would perform under similar circumstances." *Dobbins,* 788 N.W.2d at 728 (quoting *Opsahl,* 677 N.W.2d at 421). In evaluating claims of ineffective assistance of counsel, there is a strong presumption that counsel's performance was reasonable, and this court does not review matters of trial strategy or the particular tactics used by counsel. *Boitnott v. State,* 631 N.W.2d 362, 370 (Minn.2001).

Here, we conclude that the jury instructions given were not erroneous, much less plainly erroneous. Thus, the failure of appellant's trial counsel to object to them did not fall "below an objective standard of reasonableness," which means his claim fails the first prong of the *Strickland* test. An error based on a failure to notice a potentially erroneous jury instruction is not the kind of error that rises to the level of "unreasonable error" for which this court typically grants a new trial. *See, e.g., Kimmelman v. Morrison,* 477 U.S. 365, 385, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). We also conclude that the post-conviction court did not abuse its discretion in denying appellant's request for an evidentiary hearing.

Because the State presented sufficient evidence to support appellant's conviction, the district court committed no reversible error during his trial, he was not denied effective assistance of counsel, and the post-conviction court did not commit an abuse of discretion in denying appellant's request for relief, we affirm the judgment of the district court.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.