**STATE of Minnesota, Respondent,**

v.

**Donald Warren HAYES, Appellant.**

No. A11–1665.

Supreme Court of Minnesota.

May 31, 2013.

Lori Swanson, Attorney General, James B. Early, Assistant Attorney General, Saint Paul, MN; and Steven S. Collins, Redwood County Attorney, Redwood Falls, MN, for respondent.

John M. Stuart, Minnesota State Public Defender, Jessica Merz Godes, Assistant State Public Defender, Saint Paul, MN, for appellants.

## OPINION

ANDERSON, G. Barry, Justice.

Appellant Donald W. Hayes was found guilty of first-degree murder while committing domestic abuse with a past pattern of domestic abuse, and second-degree murder while committing a felony, both stemming from the death of his girlfriend's son, 13–month–old Robert Azure, Jr. In this direct appeal, Hayes challenges his first-degree murder conviction on four grounds, claiming: (1) the State presented insufficient evidence to prove that he assaulted Robert and caused his death; (2) the State presented insufficient evidence to prove that he had engaged in a past pattern of domestic abuse; (3) the district court should have instructed the jury that a past

pattern of domestic abuse requires proof beyond a reasonable doubt of at least two prior acts of abuse; and (4) the district court should have instructed the jury that it needed to agree unanimously on which two specific acts of past abuse were proven beyond a reasonable doubt. Because we conclude that the State presented sufficient evidence to sustain Hayes's conviction and that the district court did not err in its jury instructions, we affirm.

From 2000 until 2006, Hayes was involved in an on-and-off romantic relationship with A.A., with whom he had a child in March 2001. It was a volatile relationship, and Hayes committed domestic abuse against A.A. between 4 (the number Hayes acknowledges the State proved at trial) and 20 (the number alleged by the State) times while they were together.

Around July 2008, Hayes moved in with T.D. and her four children. At the time of the murder, T.D.'s oldest child, D.H., was ten; M.H. was six; C.A. was two; and Robert, her youngest child and the victim here, was 13 months old. After moving in, Hayes helped T.D. tear out the flea-infested carpeting from the living room, leaving the wood subflooring exposed. Hayes was not employed, so he took care of T.D.'s children most of the time while she worked 25 to 30 hours per week at a local fast food restaurant.

At 11:00 a.m. on the morning of September 24, 2008, T.D. woke up, put on her uniform, and walked to work, clocking in at 11:34 a.m. Her uniform had been hanging on a chair in the living room, where she left it to dry after washing it the night before. She did not have a dryer in the house, so she used a box fan to dry her uniform overnight. Hayes remained at home to take care of the two younger children, C.A. and Robert.

Around noon, Hayes took the children to a local animal shelter to look at puppies. They were at the shelter for about twenty minutes; Robert appeared healthy and petted the puppies during the visit. At 2:53 p.m., Hayes called an agent at the Drug Enforcement Agency to report drug use on the part of an ex-girlfriend with whom he and T.D. were feuding. Hayes ended the call by saying there was a child crying and he had to go.

M.H. arrived home from school around 3:30 p.m. She testified that Robert was crying, and that Hayes was swearing at him, using "the 'b' word and the 'f' word." Hayes proceeded to put Robert in the master bedroom, where his play pen (which also served as his crib) was located. D.H. then arrived home and, hearing Robert crying, looked into the bedroom. Robert looked fine to D.H., so he went to his own room to start his homework.

M.H. heard Robert cry again. She testified that Hayes displayed a "mad face" as he "went back in [the bedroom] and grabbed [Robert] and then he didn't see the fan cord and he tripped and fell right on top of him." D.H. was in his room and did not see the incident, but he heard one "little crash" that sounded like books falling.

After the fall, M.H. helped Hayes put Robert on the couch. Robert "didn't look very good" to her; he was breathing, but seemed to be struggling to open his eyes. Hayes then ran into D.H.'s room, only to run back out again. D.H. followed him out of the room, saw Robert lying on the couch, and checked his pulse. Hayes, by this point hysterical and crying, called T.D. at work and told her something was wrong with the baby.

T.D. clocked out from work and ran the block and a half to her home. When she arrived, she found Robert on the couch, with Hayes standing near him. She picked Robert up and found that his body

was limp, his breathing was shallow and rough, and his eyes were closed and fluttering. She called 911; Officer Steven Mortenson arrived within one or two minutes, with the ambulance arriving approximately one minute later. Officer Mortenson opened Robert's eyes and shined a light into them, but found that his pupils were "the size of a pinhead" and unresponsive. The ambulance took T.D. and Robert to the hospital, leaving Officer Mortenson and Hayes at the scene.

After the ambulance left, Hayes allowed Officer Mortenson inside the house and showed him where he claimed to have tripped and fallen while carrying Robert. Hayes told the officer that he had tripped over either the fan or the fan's cord—he wasn't sure which. Officer Mortenson examined the area where Hayes said Robert had landed, but did not see any blood, hair, or other evidence on the floor. Officer Mortenson spent only a few minutes at the scene before leaving for the hospital, and did not further question Hayes, who was crying and upset. Mortenson did observe, however, that there was a broken box fan lying flat on the floor in the living room, and that it had a cord, although he could not remember whether the cord was attached to the wall or to the fan itself.

By the time Robert reached the Redwood Area Hospital emergency room, he was registering a 5 or 6 on the Glasgow coma scale, indicating a severe head injury. Dr. Gregory McCallum, who was called from his nearby clinic to assist, found Robert "deeply unconscious," and began the process of transferring him to Minneapolis Children's Hospital. A CT scan revealed that Robert had suffered skull fractures and subdural hematomas.

Within the first 24 hours, it was apparent to the doctors at Minneapolis Children's Hospital that they would not be able to save Robert's life. The doctors told T.D. that it was very unlikely that Robert would survive, and that even if he did, he would have virtually no brain function. With no hope for improvement, T.D. authorized the withdrawal of life support, and Robert died on October 1, 2008.

On October 2, Dr. Andrew Baker, chief medical examiner for Hennepin County, performed an autopsy on Robert. Dr. Baker found that Robert had suffered a large stellate fracture—which is a star-shaped fracture radiating outward—centered on the back of his skull. He also found three other bruises on Robert's head, old fractures in both bones in his left arm—one of which had gone untreated—fractures to his ribs, extensive hemorrhaging in his eyes, and a tear in his frenulum.[1] But it was some combination of traumatic and hypoxic injury to his brain that actually caused Robert's death.[2]

Dr. Baker determined that Robert's cause of death was "complications of blunt force craniocerebral injuries," and that the manner of death was homicide. He testified that many of Robert's injuries were suspicious, and that a trip and fall of the type described by Hayes could not account for Robert's injuries. The fact that there were four injuries to his head did not match up with the story of a fall, for example, although Dr. Baker also said that he could not date the other bruises accurately enough to say that they happened on the same day as the fatal injury. Doctor Baker also found Robert's untreated arm fracture suspicious, and testified that "barring a very unusual prior accident, intentional injury to Robert's rib cage

---

1. The frenulum in question is a fold of membrane connecting the lip to the gum.

2. A hypoxic injury is caused when an area of the body does not receive sufficient oxygen.

would be the only explanation" for his rib fractures. He also testified that retinal hemorrhages to the degree and extent found in Robert's eyes are "more associated with inflicted injuries than accidental injuries."

Finally, Dr. Baker testified that the amount of force necessary to cause the fracture would usually be greater than the force generated by the fall Hayes described. He compared the amount of force necessary to inflict the observed injuries to a child of Robert's age to falling out of a second- or third-story window, having an "old style" television fall on one's head, or being in a motor vehicle accident without restraint. Both Dr. Tarrago of Minneapolis Children's Hospital and Dr. McCallum concurred with the assessment that Robert's injuries were too severe to be the result of a typical household fall.

Dr. John Plunkett, a forensic pathologist who has previously served as the medical examiner for several Minnesota counties and now consults in the area of infant head injuries, testified for the defense that Robert's cranial injury was consistent with Hayes's story. He also testified that Robert's rib fractures preceded his collapse by at least one week, and that he had seen other skulls injured in the same manner from falls of similar height. Dr. Plunkett noted that Hayes's account featured him walking at the time he tripped, which would impart additional force to Robert, above and beyond that of a mere gravitational fall. Plunkett testified that he could not say, however, that Robert actually sustained his injuries in the way Hayes had described.

Hayes did not request, nor did the district court give, jury instructions specifying that in order to prove a past pattern of domestic abuse, the State must prove at least two prior acts of domestic abuse beyond a reasonable doubt and achieve unanimous agreement about which specific acts of domestic abuse were proven beyond a reasonable doubt. On April 27, 2011, a jury found Hayes guilty of both second-degree murder and first-degree domestic-abuse murder and second-degree murder under Minn.Stat. §§ 609.185(a)(6), 609.19, subd. 2(1) (2012). Hayes stipulated to the aggravating factor of having a prior conviction for a heinous offense. The jury also found the aggravating factors of particular vulnerability and a position of trust and authority over Robert. On June 20, 2011, the district court sentenced Hayes to life in prison without the possibility of release. He then filed this direct appeal.

## I.

Hayes first argues that there was insufficient evidence to sustain his conviction. Specifically, he asserts that based on the circumstances proved, it could reasonably be inferred that Robert's death was accidental, and not the result of an assault, as found by the jury.

■■■ When reviewing the sufficiency of the evidence leading to a conviction, we "view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Holliday*, 745 N.W.2d 556, 562 (Minn.2008) (citation omitted) (internal quotation marks omitted). "The verdict will not be overturned if, giving due regard to the presumption of innocence and the prosecution's burden of proving guilt beyond a reasonable doubt, the jury could reasonably have found the defendant guilty of the charged offense." *State v. Leake*, 699 N.W.2d 312, 319 (Minn.2005).

■■■ Because the State's proof of Hayes's intent was based on circumstantial evidence, we conduct a two-step analysis to

decide whether that evidence was sufficient to sustain a guilty verdict.

First, we must identify the circumstances proved, giving deference "to the jury's acceptance of the proof of these circumstances and rejection of evidence in the record that conflicted with the circumstances proved by the State." Second, we independently examine "the reasonableness of all inferences that might be drawn from the circumstances proved," including inferences consistent with a hypothesis other than guilt.

*State v. Anderson,* 789 N.W.2d 227, 241–42 (Minn.2010) (quoting *State v. Andersen,* 784 N.W.2d 320, 329 (Minn.2010)) (internal citations omitted). For the first step, we defer to the fact-finder; for the second step, we engage in our own examination of the reasonableness of the inferences. *State v. Al–Naseer,* 788 N.W.2d 469, 473–74 (Minn.2010). The second step requires us to determine whether the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis except that of guilt, not simply whether the inferences that point to guilt are reasonable. *Andersen,* 784 N.W.2d at 330; *see also Al–Naseer,* 788 N.W.2d at 474. In other words, the evidence must point unerringly to the accused's guilt. *State v. McArthur,* 730 N.W.2d 44, 49 (Minn.2007) (citation omitted) (internal quotation marks omitted). But we will not overturn a guilty verdict on conjecture alone. *Anderson,* 789 N.W.2d at 242.

█ Here, the relevant circumstances proved were: (1) that Robert was in good health—capable of crying and breathing normally—immediately before Hayes's actions; (2) Robert was under Hayes's care and supervision at the time Robert was injured; (3) Hayes caused Robert to suffer an injury to his head that left him nearly comatose and struggling to breathe; (4) Robert's cranial trauma was more severe

than could be explained by a mere accidental household fall; and (5) the injury Hayes inflicted on Robert caused Robert's death.

The next step is to "determine whether the reasonable inferences that can be drawn from the circumstances proved are consistent with guilt and inconsistent with any rational hypothesis other than [Hayes]'s guilt." *Andersen,* 784 N.W.2d at 331. In order to sustain Hayes's conviction of first-degree murder under Minn. Stat. § 609.185(a)(6) (murder while committing domestic abuse with a past pattern of domestic abuse), the State needed to prove that Hayes "intentionally inflict[ed] or attempt[ed] to inflict bodily harm upon another." Minn.Stat. § 609.224, subd. 1(2) (2012); Minn.Stat. § 609.2242, subd. 1(2) (2012). Hayes concedes that the circumstances proved support a reasonable inference that he caused Robert's death while committing an intentional assault. Nevertheless, Hayes argues that the circumstances proved also support a reasonable inference that he accidentally caused Robert's death when he tripped over a box fan (or its electrical cord).

For this claim, Hayes relies on Dr. Plunkett's testimony that Robert's skull fracture was consistent with the accidental scenario Hayes described. Hayes's reliance on Dr. Plunkett's expert opinion is misplaced, however, because that opinion is not part of the circumstances proved in this case. As discussed above, in determining the circumstances proved in this case we must assume the jurors rejected Dr. Plunkett's testimony, and instead believed the testimony of the State's experts that Robert's cranial trauma was more severe than could be explained by a mere accidental household fall. Because the circumstances proved in this case include a finding that Robert's cranial trauma was more severe than could be explained by a

mere accidental household fall, the circumstances proved do not support a reasonable inference that Hayes accidentally caused Robert's death when he tripped over a box fan (or its electrical cord).

Hayes also relies on M.H.'s testimony that she saw him trip while carrying Robert, and Officer Mortenson's testimony that he saw a broken fan lying on the floor in the living room on the day of the incident.[3] Again, Hayes's reliance on this testimony is misplaced because we must assume the jurors rejected the testimony of M.H. and Officer Mortenson. Moreover, even if we could assume that the jury believed the testimony of M.H. and Officer Mortenson, the circumstances proved still do not support a rational hypothesis that Hayes accidentally caused Robert's death because, as mentioned above, the circumstances proved include the fact that Robert's cranial trauma was more severe than could be explained by a mere accidental household fall. Because the circumstances proved support a rational inference of intentional assault and are inconsistent with any rational hypothesis except that of an intentional assault, we conclude that the State presented sufficient evidence to prove that Hayes caused Robert's death while committing an intentional assault.

## II.

■ Hayes next argues that, even if the State presented sufficient evidence to prove that he caused Robert's death while committing an intentional assault, his conviction must still be reversed because the State failed to prove beyond a reasonable

doubt that he had engaged in a past pattern of domestic abuse. An individual is guilty of first-degree domestic-abuse murder if he "causes the death of a human being while committing domestic abuse, when the perpetrator has engaged in a past pattern of domestic abuse upon the victim or upon another family or household member and the death occurs under circumstances manifesting an extreme indifference to human life." Minn.Stat. § 609.185(a)(6). The statute defines domestic abuse as conduct constituting first-, second-, third-, or fifth-degree assault; domestic assault; first-, second-, third-, or fourth-degree criminal sexual conduct; or terroristic threats. Minn.Stat. § 609.185(c)(1) (2012). A "family or household member" under section 609.185, paragraph a(6) includes, in relevant part, "persons who are presently residing together," and "persons who have a child in common." Minn.Stat. § 518B.01, subd. 2(b)(4)-(5) (2012).

■ The term "past pattern" is not defined in the statute. We have interpreted the provision to require more than one incident of past domestic abuse. *State v. Johnson*, 773 N.W.2d 81, 86 (Minn.2009) ("However, a lone prior act 'does not and cannot constitute a pattern'.") (quoting *State v. Grube*, 531 N.W.2d 484, 491 (Minn. 1995)) Though necessary, the presence of at least two prior acts of domestic abuse may not be sufficient. The State also must prove that the past abuse constituted " 'a regular way of acting' " for the defendant. *Id.* (quoting *State v. Robinson*, 539 N.W.2d 231, 237 (Minn.1995)). Prior acts

---

**3.** Relying on M.H.'s testimony, Hayes asserts an additional argument. Specifically, Hayes argues the State failed to present sufficient evidence to support his conviction because the State's theory of the case (intentional injury) was supported by solely *circumstantial evidence*, while his theory of the case (accidental injury) was supported by *direct evi-*

dence—M.H.'s testimony that she saw him trip while carrying Robert. This argument is unpersuasive. When considering a sufficiency of the evidence claim, we must assume that the jury rejected M.H.'s testimony, in which case there are no facts—found to be true by the jury—to support Hayes's theory of the case.

that are not sufficiently proximate in time do not constitute a pattern. *Id.*

> [W]hether a past pattern of domestic abuse exists is a fact-intensive inquiry that often is not answered in purely mathematical terms. We do not focus only on the number of incidents of past abuse in order to determine whether a reasonable jury could have found a past pattern of domestic abuse.

*State v. Her,* 750 N.W.2d 258, 278 (Minn. 2008), *rev'd on other grounds,* 555 U.S. 1092, 129 S.Ct. 929, 173 L.Ed.2d 101 (2009).

Hayes admits that the State proved four incidents of domestic abuse against A.A., with whom he has a child in common. Moreover, A.A. testified that Hayes was physically abusive to her around 20 times during their relationship. Hayes argues, however, that such instances of abuse were limited to his adult romantic partner, and therefore did not constitute a regular way of acting with regard to children. He provides no support for such a distinction, either in the statute or in case law. Indeed, the use of broad terms such as "family or household member" suggests that different types of victims were actually contemplated by the legislature in drafting the statute. We therefore reject Hayes's attempt to add classes of victims to the past pattern statute that are not listed in the statute, and conclude that there was sufficient evidence of a past pattern of domestic abuse to sustain his conviction of first-degree murder under Minn.Stat. § 609.185(a)(6).

### III.

Hayes next argues that the district court committed plain error when it failed to instruct the jury that the State must prove at least two prior acts of domestic abuse beyond a reasonable doubt.

 Unobjected-to jury instructions are reviewed for plain error. *State v. Laine,* 715 N.W.2d 425, 432 (Minn.2006). Under a plain error analysis, Hayes must show that (1) there was error; (2) the error was plain; and (3) his substantial rights were affected. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). An error is plain if it "contravenes case law, a rule, or a standard of conduct." *State v. Ramey,* 721 N.W.2d 294, 302 (Minn.2006). "If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings." *Griller,* 583 N.W.2d at 740. The defendant has the burden of proof on the third element of the test, and it is considered a "'heavy burden.'" *Ramey,* 721 N.W.2d at 302 (quoting *Griller,* 583 N.W.2d at 741).

 Additionally, district courts have latitude in choosing jury instructions. *State v. Baird,* 654 N.W.2d 105, 113 (Minn. 2002). "The district court has broad discretion in determining jury instructions, and we will not reverse where jury instructions 'overall fairly and correctly state the applicable law.'" *Stewart v. Koenig,* 783 N.W.2d 164, 166 (Minn.2010) (quoting *Hilligoss v. Cargill, Inc.,* 649 N.W.2d 142, 147 (Minn.2002)).

 We recently addressed Hayes's argument in *State v. Hokanson,* 821 N.W.2d 340 (Minn.2012).[4] There, we said:

> Appellant argues that the instruction given was plainly erroneous because it

---

**4.** The fact that *Hokanson* dealt with child abuse rather than domestic abuse is immaterial here. *See Johnson,* 773 N.W.2d at 86 ("The statutory definitions of first-degree child abuse murder and first-degree domestic abuse murder are nearly identical.... Because of the similarity in wording between the child abuse and domestic abuse provisions, we interpret the provisions similarly.").

did not clearly state that at least two separate incidents of child abuse that make up the past pattern of child abuse must be proven by the State beyond a reasonable doubt. . . .

When viewed as a whole, we conclude that the district court's jury instructions fairly and correctly state the applicable law. Nothing in the instructions suggest that a lesser standard of proof is applied to the requirement that the State prove more than one prior act of abuse for there to be a past pattern of child abuse. Instead, the court's instructions repeatedly and consistently informed the jury that the State's burden of proof was "beyond a reasonable doubt."

*Id.* at 356–57. Given that the facts here are far less favorable to Hayes than those present in *Hokanson*—it is undisputed that the State here has proven at least four incidents of abuse beyond a reasonable doubt—we apply the same reasoning to conclude that the district court did not err in its jury instruction.

### IV.

▉ Finally, Hayes argues that his right to a unanimous verdict was violated when the district court failed to instruct the jury that it must achieve unanimous agreement about which specific acts of domestic abuse were proven beyond a reasonable doubt. We addressed this issue in *State v. Crowsbreast,* 629 N.W.2d 433 (Minn.2001):

The grouping of past acts of domestic abuse as a preliminary factual element of domestic abuse homicide, which underlies the verdict, is in no way an irrational or unfair definition of domestic abuse homicide, nor are those acts so inherently separate as to present a due process issue as to jury unanimity. . . . We conclude that jurors are not required to unanimously agree on which

acts comprised the past pattern of domestic abuse. "[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line."

*Id.* at 439 (quoting *Schad v. Arizona,* 501 U.S. 624, 631–32, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991)) (second omission in original).

Hayes has put forward no argument to support overturning *Crowsbreast,* and we decline to do so. We therefore conclude that his argument on this issue lacks merit.

Because the State presented sufficient evidence to support Hayes's conviction and the district court did not err in its jury instructions, we affirm the judgment of conviction.

Affirmed.

WRIGHT, J., not having been a member of this court at the time of submission, took no part in the consideration or decision of this case.

### CONCURRENCE

STRAS, Justice (concurring).

I join Parts III and IV of the court's opinion. I concur only in the judgment of the court on Parts I and II, however, because I am concerned that the court's lack of specificity on the standard of review will only perpetuate the confusion in our case law on sufficiency of the evidence claims. *See State v. Silvernail,* 831 N.W.2d 594, 602–03, No. A12–0021, 2013 WL 2364094, slip op. at 2–3 (Minn. May 31, 2013) (Stras, J., concurring).

In this case, the record reveals that neither of the disputed elements of Hayes's criminal conviction was proven by the State through a *combination* of direct and circumstantial evidence. Given the

state of the record, I agree with the court that the evidence is sufficient to sustain Hayes's conviction of first-degree murder while committing domestic abuse, but I would apply the "traditional standard" to the "past pattern" element and the "circumstantial evidence standard" to the question of whether Hayes intentionally assaulted Robert in affirming Hayes's conviction.

## DISSENT

ANDERSON, Paul H., Justice (dissenting).

I respectfully dissent. The confluence of three key factors in this case leads me to conclude that the defendant Donald Warren Hayes did not get a fair trial. The three factors are: (1) the nature, content, and thrust of the medical examiner's testimony, (2) the State's willingness to compound the potential harm from the medical examiner's testimony by employing suggestions, innuendos, and insinuations, and (3) the fact that our standard of review for claims of insufficient evidence once again magnifies the importance of a medical examiner's testimony and the potential for permanent harm when the State uses such testimony to obtain an otherwise uncertain conviction.

At first glance, none of these three factors standing alone may appear to create a situation sufficient to warrant reversal and a new trial—but, when scrutinized together, they do just that. The confluence of these factors has created a situation in which it is difficult, if not impossible, for me to conclude that the defendant received a fair trial. Moreover, the errors that deprived the defendant of a fair trial were not harmless beyond a reasonable doubt— there simply is not enough evidence in this record to convince me beyond a reasonable doubt that the error did not have a significant impact on the jury's verdict of guilty.

Therefore, I dissent. I would reverse and remand for a new trial.

The facts of this case are tragic. A little child, 13-month-old Robert, is dead. The medical examiner testified that "Robert died of complications of blunt force craniocerebral injuries." In more understandable terms, Robert died as the result of brain injuries marked by a large star-shaped fracture centered on the back of his skull. There is evidence that Robert's life shortly before and at the time of his death was filled with physical trauma. A post-death medical examination revealed evidence of four other bruises to Robert's head; two fractures in his left arm, one of which had gone untreated; rib fractures; extensive hemorrhaging in his eyes; and a tissue tear in his mouth. It is definitely not normal for a child to have this many injuries—especially of this type and magnitude.

Robert suffered the fatal brain injury while in the care of the defendant, Donald Warren Hayes. Hayes is an unsympathetic defendant and, not surprisingly, his character and past behavior became a major issue in this case. At the time of Robert's death, Hayes was involved in a romantic relationship with Robert's mother, T.D. Around July 2008, Hayes moved in with T.D. and T.D.'s four children, 10-year-old D.H., 6-year-old M.H., 2-year-old C.A., and the infant Robert. Hayes was unemployed at the time, so when T.D. was working 25 to 30 hours per week at a local fast-food restaurant, Hayes looked after her children—for about 90 percent of that time.

The evidence shows that Hayes joining T.D.'s household was not a positive turn of events for T.D.'s children. Friends who knew the children testified that the children were happy before Hayes moved in, but after he moved in the children were

"scared" and "weren't happy." The record shows that the children suffered physical abuse while Hayes was in the home, but there was no evidence directly linking Hayes to injuries that would be classified as abuse. There is also evidence that Hayes physically abused a woman with whom he had an on-and-off romantic relationship between 2000 and 2006.

But the question before us is not whether Hayes is a good person—the record indicates that he falls short of being a model citizen. The key question is not whether Hayes's past behavior shows that he is capable of hurting other people. The question before us is whether the State has proven beyond a reasonable doubt that on the afternoon of September 24, 2008, Hayes committed first-degree domestic abuse murder resulting in the death of 13–month–old Robert. The answer to that question is not so clear, and I will explain why I have come to this conclusion.

*The Medical Examiner's Testimony*

While there is evidence in the record that Robert was the subject of prior abuse, the evidence that Robert was murdered by Hayes on September 24, 2008, as opposed to being the victim of an accident, was circumstantial and hotly contested. In this context, the weight of the medical examiner's forensic testimony and conclusion as to the cause of Robert's death is highly significant.

When we apply our standard of review to the facts of the case before us today, I am concerned that our application of that standard has led us to improperly affirm Hayes's conviction. Here, the medical examiner's testimony came close to invading—or even did invade—the province of the jury. In his testimony at trial, the medical examiner rendered the ultimate conclusion that 13–month–old Robert's death was the result of a homicide committed by Hayes. Upon rendering this conclusion, the medical examiner not only implied that Hayes was guilty of the crime as charged, but provided testimony that directly refuted Hayes's claim that the cause of death was an accidental injury. It refuted Hayes's defense that he tripped on a fan cord while carrying Robert, causing both Hayes and Robert to fall and hit the floor. It also rejected the testimony of Robert's sister, M.H. M.H. testified that Hayes heard Robert cry again and while displaying a "mad face" Hayes "went back in [the bedroom] and grabbed [Robert] and then [Hayes] didn't see the fan cord and he tripped and fell right on top of [Robert]."

At this point, it is prudent to review what the medical examiner told the jury. The medical examiner said that the manner of death was homicide, that many of Robert's injuries were "suspicious," and that a trip and fall of the type described by Hayes and M.H. could not account for the injuries that caused Robert's death. The medical examiner testified that Robert's injuries were too severe to be the result of a typical household fall—an opinion that was shared by two other physicians and a nurse, all of whom treated Robert. Such testimony is within the medical examiner's expertise, but the medical examiner's testimony was also supplemented with multiple references to Robert's prior injuries. It is within the ambit of this part of the medical examiner's testimony where the problems reside. The medical examiner repeatedly used these earlier injuries, none of which was directly linked to Hayes, and others which clearly had other causes, as the basis for his testimony that the fall Hayes described was not the ultimate cause of Robert's death. I conclude that the testimony that followed from this conclusion may have invaded the decision-making process of the jury.

Here are some of the relevant parts of the medical examiner's testimony:

Q. And what was essentially the short version of what you understand Mr. Hayes's explanation to be for Robert's injury on the 24th of September?

A. My understanding would be that Mr. Hayes was carrying Robert. Mr. Hayes tripped over a fan causing him to fall and drop Robert on, as I recall, he specifically stated that he did not land on top of Robert.

Q. Did that explanation account for the death of Robert as you determined it to have been caused?

A. No I don't believe it does.

Q. Why is that doctor?

A. Ah well there's a couple of reasons for that. One reason is that Robert has more than one bruise on his head and so—and we'll show you pictures of this later but basically he's got multiple impact sites on his scalp, not just one. The nature of Robert's skull fracture is far in excess of my understanding of what infants would usually sustain from a—from a simple indoor fall. And—and again, I'll show you a picture of Robert's skull fracture to explain just what I mean by the term far in excess of—um and *the other thing that's very disconcerting about Robert's case is that he was found to have a broken arm that was healing at the time he presented with his head injury unbeknownst to the clinicians but discovered at autopsy, Robert also had four healing rib fractures when I examined him at autopsy. The rib fractures would be very difficult um to explain by a fall. You know, barring a very unusual prior accident, intentional injury to Robert's rib cage would be the only explanation for those as well. So when I take a child with a head injury like Robert's in the context of other very suspicious injuries, it's very difficult for me to—to accept that as being from a trip and fall. . . .*

Q. Now in this case doctor, you had information that the defendant had said that he had tripped and fallen with Robert in his arms and that Robert apparently had then landed some six or eight feet from him hitting the wooden floor and then started breathing funny. Do you—do you recall that?

A. Yes.

Q. And why is it that you don't think that fall accounts for Robert's ultimate death?

A. Well, there's a couple of reasons for that. First is the death from a head injury due to an indoor fall in an infant would be a very, very unusual event to begin with. In Robert's case, I also have to deal with the fact that his skull fracture is not a relatively simple or linear fracture. It's actually a fairly large fracture that is stellate that crosses suture lines and Robert obviously has a devastating life threatening brain injury concomitant with that fracture. *Um then I have to put that in the context of this is a child who has a broken arm that's untreated and we go on to discover four ribs that are fractured in a place that really, in a circumstance like this, abuse is about the only legitimate reason that you would have those rib fractures. So when I take all of those things together, to me, the only logical conclusion is*

*that history is not telling you what really happened.*

(Emphasis added).

Later, during direct examination by the State, Robert's sister, M.H., provided direct testimony that contradicted the medical examiner as to the cause of death when she described witnessing Hayes trip over the fan cord and fall when he was carrying Robert. M.H.'s testimony is as follows:

Q. [M.H.], do you remember the day that your brother got taken in the ambulance to the hospital?

A. Yes.

Q. Were you home before that?

A. Yes.

Q. And did you go to school that day?

A. Yes.

Q. What happened once you got home from school?

A. Um Robert was crying and [Hayes] kept on swearing at him. He said the "b" word and the "f" word to him and—and put him in his crib and—and then he started crying and [Hayes] went back in and grabbed him and then he didn't see the fan cord and he tripped and fell right on top of him.

M.H.'s testimony was in part corroborated by Robert's brother, D.H. D.H. testified that when he got home from school, Robert was fine and while D.H. was in his bedroom doing homework he heard the sound of "a little crash" that sounded "[l]ike books falling."

Hayes also presented testimony from a medical doctor, with 30 years of experience as a forensic pathologist, that Robert's head injuries were consistent with Hayes's description of a trip and fall. The physician explained how "Newtonian mechanics" ("the study of motion") and biomechanics ("the application of the principles of mechanics to living tissues") can be used to quantify the amount of force necessary to account for the head injuries that Robert sustained. The physician described several studies that have applied the principles of Newtonian mechanics to injury evaluation. The physician then explained how he used the knowledge gained from the data generated in these studies to quantify the amount of force necessary to cause the injuries Robert sustained and to reach the conclusion that the injuries were consistent with Hayes's tripping and falling. The physician went on to testify that there is no way to evaluate the likelihood of Robert's injuries having been inflicted accidentally versus intentionally because the act of walking, tripping, and falling with Robert is a mechanically equivalent event to the act of throwing him into a wall. While medical opinions can legitimately vary, the testimony of the defendant's physician raises question regarding the medical examiner's certitude as to the ultimate question here: What and who, if anyone, caused Robert's death?

We have repeatedly expressed both caution and concern about expert opinions that embrace legal conclusions and invade the province of the jury. Our rules of evidence only permit expert opinion testimony if such testimony is helpful to the factfinder. We engaged in an extensive discussion of our view on the proper role of expert testimony in *State v. Moore*, 699 N.W.2d 733 (Minn.2005). In that case, we said:

Because an expert with special knowledge has the potential to unduly influence a jury ... "[s]pecial care must be taken by the trial judge to ensure that the defendant's presumption of innocence does not get lost in the flurry of expert testimony and, more importantly, that the responsibility for judging credibility and the facts remains with the jury."

*Id.* at 739–40 (quoting *State v. Grecinger,* 569 N.W.2d 189, 193 (Minn.1997)). We have also said:

> Expert opinion testimony is not helpful if "the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience." *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980).

*Id.* at 740 (quoting *State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980)).

Under our helpfulness test, we generally do not allow ultimate issue testimony. We have been very explicit on this point. We have said:

> Under the helpfulness test, this court "has not allowed ultimate conclusion testimony which embraces legal conclusions or terms of art." In addition, this court has stated that "[w]hile the evidentiary rules do not bar all expert testimony concerning the ultimate issue, a district court may exclude ultimate issue testimony ... when the testimony would merely tell the jury what result to reach."

*Id.* (citations omitted).

What we said in *Moore* for the most part echoed what we had said more than 20 years earlier in *State v. Saldana,* 324 N.W.2d 227 (Minn.1982). We stated that expert testimony is only admissible if it is helpful to the jury. We explained:

> If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test.

*Id.* at 229 (quoting *Helterbridle,* 301 N.W.2d at 547). We concluded:

> If the jury is in as good a position to reach a decision as the expert, expert testimony would be of little assistance to the jury and should not be admitted. Expert testimony may also be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, or misleading the jury. Minn. R. Evid. 403. Under this test of admissibility, we must examine each segment of [an expert's] testimony.

*Id.* (citation omitted). Later in *Saldana,* we added the following observation:

> The primary criterion for admissibility is the helpfulness requirement as discussed above. An expert witness may testify in the form of an opinion, Minn. R. Evid. 702, and opinion testimony is not objectionable merely because it embraces an ultimate issue to be decided by the jury, Minn. R. Evid. 704. However, according to the Advisory Committee Comment to Rule 704, opinions involving a legal analysis or mixed questions of law and fact are deemed to be of no use to the jury.

*Id.* at 230.

What concerns me most about the medical examiner's testimony is that he took his analysis of the injuries that he concluded were the immediate cause of Robert's death, tightly tethered those injuries to Robert's prior injuries, and then linked the prior injuries to the fatal injury in order to opine that Hayes killed Robert in some manner other than an accidental fall. The medical examiner then asserted that a fall as described by Hayes and M.H. could not have been the cause of the injuries that killed Robert. The State took this testimony and used it to speculate that Hayes "slammed Robert's head into a hard surface." The State presented this speculation to the jury even though a thorough

search of T.D.'s entire residence by the Bureau of Criminal Apprehension revealed no forensic evidence to support it. While the foregoing conclusion by the medical examiner could have been reached by the jury when rendering a verdict, it was not an opinion the medical examiner should have been permitted to convey. In essence, the medical examiner's opinion invaded the legitimate realm of the jury as the factfinder.

*The Role of the Medical Examiner*

We expect independence, autonomy, and neutrality from our medical examiners. Medical examiners are state actors in the criminal justice system who have a very key role to play. We have said that medical examiners theoretically enjoy autonomy from those government officials directly responsible for investigating and prosecuting crimes. *See State v. Beecroft,* 813 N.W.2d 814, 833 (Minn.2012). By statute, a "medical examiner is an *independent* official of the county, subject only to appointment, removal, and budgeting by the county board." Minn.Stat. § 390.011 (2012) (emphasis added). Thus, similar to a traditional coroner who occasionally worked alongside the county sheriff but also acted as a check on the sheriff's power, a medical examiner may from time to time assist law enforcement by conducting honest and objective death investigations, but must at all times remain a neutral participant in our criminal justice system.

It is "undisputed that the quality of forensic investigation improves when medical examiners operate free from the influence of law enforcement and prosecutors." *Beecroft,* 813 N.W.2d at 833 (citing Nat'l Research Council of Nat'l Acads., *Strengthening Forensic Science in the United States: A Path Forward* 23–24 (National Academies Press 2009)). The National Association of Medical Examiners ("NAME") proclaims in its standards for medicolegal death investigations "that independence from law enforcement agencies and prosecutors 'promotes neutral and objective medical assessment of the cause and manner of death.'" *Id.* at 833–34 (quoting Garry F. Peterson & Steven C. Clark, Nat'l Assoc. of Med. Standards, *Forensic Autopsy Performance Standards* 7 (2011)). Accordingly, "most medical examiners 'view themselves first and foremost as scientists, beholden not to one side or the other, but only to the truth.'" *Id.* at 883 (quoting Mark Hansen, *CSI Breakdown,* A.B.A. J., Nov. 2010, at 44, 46). Stated differently, a medical examiner's primary purpose is not to solve crimes but to serve the public by determining how people die. *See, e.g., United States v. Rosa,* 11 F.3d 315, 332 (2d Cir.1993). In *Rosa,* the Second Circuit said:

> [Al]though law enforcement activities are typically accusatory and adversarial in nature, a medical examiner's reported observations as to a body's condition are normally made as part of an independent effort to determine a cause of death. Indeed, a medical examiner, although often called a forensic expert, bears more similarity to a treating physician than he does to one who is merely rendering an opinion for use in the trial of a case.

*Id.* (citation omitted) (internal quotation marks omitted); *see also People v. Washington,* 86 N.Y.2d 189, 630 N.Y.S.2d 693, 654 N.E.2d 967, 969 (1995) (explaining that a medical examiner's mandate "is clear, to provide an impartial determination of the cause of death"). It is unfortunate that "[s]ome police and prosecutors tend to view government-employed forensic scientists, including medical examiners, not as independent experts, but as members of the prosecution's 'team.'" *Beecroft,* 813

N.W.2d at 834 (quoting Hansen, *supra*, at 46).

It is important to keep in mind that, as physicians, medical examiners are forensic scientists and as such they are treated as expert witnesses. Their testimony carries much weight in a courtroom. If anyone has any doubts on this point, all they have to do is ask a trial attorney about the CSI effect on jurors. *See* Andrew P. Thomas, *The CSI Effect: Fact or Fiction*, 115 Yale L.J. Pocket Part 70, 70–72 (2006) (surveying experienced prosecutors with trial experience about the CSI effect on jurors). But forensic scientists, like everyone else, do make mistakes. *Beecroft*, 813 N.W.2d at 835–36. That is why we must put in place systems and procedures that make sure the work product and the nature and scope of forensic experts like medical examiners will be properly framed and scrutinized. Because the opinions of experts like medical examiners are so highly valued and have such an impact in the courtroom, we must hold their opinions to the highest standards so that mistakes are not made.

Because forensic science testimony in general, and medical examiner forensic testimony in particular, typically carries such great weight, there is considerable potential for such testimony to mislead a jury if not carefully scrutinized. While we expect "independence, autonomy, and neutrality" from a medical examiner, we do not always receive it. *See generally Beecroft*, 813 N.W.2d at 831–36. This is why both defense counsel and the court must monitor the nature and content of this testimony. We noted this need when we said that:

> Justice Harry Blackmun recognized that jurors "tend to assume [scientific evidence] is more accurate and objective than lay testimony." Consequently, "[t]he major danger of scientific evidence is its potential to mislead the jury" because "an aura of scientific infallibility may shroud the evidence and thus lead the jury to accept it without critical scrutiny."

*Id.* at 839 n. 14 (citations omitted). The nature of the medical examiner's testimony at Hayes's trial, when combined with how the State used that testimony, is at the heart of what concerns me about this case.

### The State's Closing Argument

The problems with the medical examiner's testimony were exacerbated when the State, in its closing argument, emphasized over and over again the other injuries suffered by T.D.'s children, many of which were not linked or attributed to Hayes. The State repeatedly referenced the children's injuries and maladies, creating the implication for the jury that Hayes caused them. There were several references by the State to injuries to the children that had no explanation or testimony linking them to Hayes.

The State's final argument contains an inordinate amount of inflated rhetoric. It is laden with suggestions, innuendos, and insinuations. Examples include using the term "child molester" in connection with Hayes when he was never so much as accused of such a crime, and implying that Hayes was connected to several injuries to Robert that the State knew he did not cause. It contained many statements that were unfounded, with no support in the trial record. There was a specific implication that stomach cramping and constipation problems experienced by one of the children were caused by Hayes, despite the fact that there was nothing in the record linking Hayes to the child's malady. The argument even contained an implicit suggestion that if circumstances had been different, one of the witnesses would not be alive today because Hayes would have

killed her. The closing statement was also filled with dismissive and derisive comments about Hayes's parenting skills—including rhetorical statements bordering on sarcasm. After reviewing the closing argument, I am left with the impression that the State improperly based its argument on the premise that the jury should convict Hayes because he is a bad person. While Hayes may in many respects be a bad person, that is not a proper basis upon which to convict him of first-degree murder.[1]

Impartiality is more than just a goal for every person who represents the sovereign—it is a duty. Improper suggestions, innuendos, and insinuations have no place in a prosecutor's tool box. A prosecutor who represents the government is a minister of justice. The Supreme Court and our court have made this point on so many occasions that they need not be cited. A good example appears in *Berger v. United States* where the Supreme Court said that a prosecutor:

is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that *justice shall be done.* As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.

295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935) (emphasis added).

*Standard of Review*

Even if improper forensic testimony does not sway a jury, it can still have a powerful, illegitimate effect on the outcome of a criminal prosecution. When appellate courts in Minnesota review the sufficiency of the evidence leading to a conviction, "we view the evidence in the light most favorable to the verdict and assume that the factfinder disbelieved any testimony conflicting with that verdict." *State v. Holliday,* 745 N.W.2d 556, 562 (Minn.2008) (citation omitted) (internal quotation marks omitted). When we apply this standard of review to cases where the conviction is based on an expert's forensic evidence, the harm that can result should the forensic witness exceed the bounds of his or her scientific expertise can be magnified. Because we entrust medical examiners with such great power, we must—and do—demand that they exercise that power with the utmost care, impartiality, and integrity. The bottom line for the foregoing scenario is that when we apply our standard of review in a case like the one before us today— where there is a confluence of multiple

---

1. I have included in an attached appendix several of the actual statements made by the State so that the reader can render his or her own judgment as to the nature of the arguments made by the State.

factors that are at best on the edge of error—there is an enhanced possibility that errors may pass by us uncorrected.

When all is said and done with respect to the case before us, it is difficult to point to one specific act or factor that constitutes clear error. Did the medical examiner just play it close to the line or did he step over the line? Did the State in its prosecution of this case willingly exacerbate the problems we now face by deliberately making an attempt to expand the scope of the medical examiner's testimony? Were the numerous suggestions, innuendos, and insinuations made by the State in its closing argument the legitimate pursuit of justice "with earnestness and vigor?" *Berger*, 295 U.S. at 88, 55 S.Ct. 629. Was the State merely striking "hard blows?" *Id.* On the other hand, was the State striking "foul ones" by using "improper methods calculated to produce a wrongful conviction?" *Id.* I concede that discerning the correct answers to these questions is difficult and open to legitimate debate, and may result in differing conclusions. What I can say for certain is that in this tragic and difficult case, I am not left with a clear and strong conviction that there was no error or that any error was harmless beyond a reasonable doubt. Therefore, I would reverse and remand for a new trial so that we can be assured that "justice shall be done." *Id.*

PAGE, Justice (dissenting).

I join in the dissent of Justice Paul H. Anderson.

APPENDIX

The following are excerpts from the State's closing argument that illustrate the inflated rhetoric used by the State. Some of the statements require no comment; others have an additional note following the statement indicating why the comment

may have been irrelevant, improper, or an inappropriate appeal to emotion in an effort to prejudice the jury. All quotes are presented verbatim.

A. Medical Examiner Testimony

As a result of that autopsy, the cause of death, according to [the medical examiner] and according to [defendant's doctor], frankly, is complications of blunt force cranial cerebral injuries. [The medical examiner], based on all of the information that's provided to him and his autopsy findings and the medical records, determines that the manner of death is homicide[;] death at the hands of another. It's not accident.

Transcript at 2695.

This passage highlights how the medical examiner stepped over the line and into the province of the jury by incorporating other "information that's provided to him" into his conclusions rather than limiting himself to describing the results of his forensic work. The passage also shows how the State exacerbated the medical examiner's trespass by leveraging the authority and credibility of the medical examiner's position to bolster the jurors' acceptance of conclusions that should only be made by the jurors themselves.

B. Injuries to Children Not Attributable to Hayes

This section contains several passages in which the State describes injuries to T.D.'s children. The State provides no evidence that Hayes actually caused these injuries. In many cases, the State even admits that Hayes did *not* cause them. The only possible reason for the prosecutor to describe such injuries, especially at this length, is to insinuate to the jury that Hayes actually harmed these children and thus deserves to be punished. Such prejudicial tactics do nothing to establish whether Hayes actual-

ly committed the crime for which he was charged, and therefore are not helpful to the jury. The statements also violate the prosecutor's duty to the defendant and the court, and his role as a minister of justice. The relevant passages are as follows:

In [C.A.]'s case, she was examined by [a doctor] at Children's Hospital. You'll have a chance to look at these pictures. It's kind of a little sad face there trying to show the bruise on her forehead. But most significantly from [the doctor's] standpoint are the bruises on her right ear including this area in the conchal bowl I think was the name and then on the back; that kind of bruise that comes from basically boxing her ears. She's also got this big bruise on her back and another bruise kind of up here by her eye next to where it got cut on the table when the defendant and [T.D.] were both in the living room. And there's another kind of area here on her left ear as well. And even the defendant admits that at one point, Robert had a bruise on his ear too that [T.D.] had seen and that he attributed to [C.A.] having pushed Robert off the sofa.

Transcript at 2673–74.

On June—I'm sorry, July 20th of '05, [M.H.] was taken in to see [a doctor] for a fractured left arm after she got pushed off a·slide. [T.D.] didn't see that happen but the children who did witness it came in, including the little boy I believe she said it was who actually pushed [M.H.] off the slide. And they tell [T.D.] that's what happened. Contrast that with so many of the injuries that happened to Robert and that happened to [C.A.] during that last month of Robert's life. Let's fast forward to April 25th of 2008. [T.D.] takes Robert in to see [a doctor] and he ends up being hospitalized for two days because he's got pneumonia. On May 22nd of 2008,

[A.S.] took Robert in to see [a doctor] for coughing and wheezing. On June 11th of '08, [M.H.]'s elbow gets sprained while she's wrestling with [D.H.] and [D.H.] admitted that. And [M.H.]'s old enough. She can talk about this so there's no question that that's what happened. There's an explanation there. On June 15th of 2008, [T.D.] moves to [a new address]. (Coughs) Either at the end of June or sometime early July, the defendant moves into the home with [T.D.] and he says that he babysits the children ninety percent of the time when [T.D.] is at work at [a fast-food restaurant] a few blocks away. On July 22nd, [C.A.] sees [a doctor] for a facial laceration which you can see here in Exhibit 57 right at kind of the corner of her eye when her—when she's pushed off the table. And neither [T.D.] nor the defendant did that. They're in the living room when that happens but the kids come in and they say this is what happened.

Transcript at 2684–85.

On September 12th, [D.H.] is seen for his kind of stomach cramping and constipation problems which once he got out of the home, frankly it resolved itself, as have the other issues in many respects the children had to deal with. On September 15th of 2008, [T.D.]'s at work and she gets a call from the defendant telling her that [C.A.] had pushed Robert off of the couch. That's the defendant's version of what had happened.

Transcript at 2686–87.

So here, he[']s again coming up with an explanation for what he believes at that point to be a leg fracture and—and he[']s blaming [D.H.] for it. And [D.H.] did tell you one time he did pull—pull Robert[']s leg and [T.D.] says she saw Robert ah and—and [D.H.] in some kind

of wrestling situation although she said it was kind of a headlock sort of thing. Transcript at 2712.

The defendant's story does not account for Robert's devastating and his fatal brain injury and the complex branching skull fracture. The defendant's story doesn't account for Robert's multiple rib fractures. The defendant's story doesn't account for Robert's arm fracture.

Transcript at 2715–16.

While the last passage may not be as clear as the others, it is problematic because the medical examiner testified that Robert's arm fracture was already healing at the time of his death. Therefore, the arm injury appears to have happened before the fatal head injury, and the State presented no evidence showing that Hayes caused the arm injury or was even present when the arm injury occurred. It would be odd for the prosecutor to expect Hayes's story to account for an injury that Robert suffered at some indefinite time in the past. A more plausible explanation for the prosecutor's statement is that the prosecutor believed it would be advantageous to present the jury with yet another injury to an infant, hoping that the emotional impact of hearing about the injury would help to obscure the fact that the prosecutor was attempting to discredit Hayes for failing to explain something the prosecutor had no reason to expect Hayes to know.

## C. Inflated Rhetoric, Innuendo, Insinuation, and Suggestion

The common theme in this set of excerpts is the prosecutor's failure to fulfill his duty as a minister of justice. *Berger v. United States,* 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). While many of these examples may be defensible in isolation, collectively they indicate an improper focus on obtaining a conviction rather than ensuring that "justice shall be done." *Id.*

### 1. *Appeal to Emotion, Not Reason*

In this case, there is not a confession from the defendant that he brutally slammed Robert's head into a hard surface causing that acute and ultimately fatal brain injury but we do have evidence of the nature of the injuries that little Robert suffered and the injuries that [C.A.] suffered as well.

Transcript at 2668.

Robert ... was not able to testify because Robert isn't with us anymore. But Robert did testify in effect through the various doctors in this case because he couldn't talk. But those doctors, whether it's at the—the clinic here in town or Children's Hospital or at the Hennepin County Medical

Examiner's Office, are here speaking for Robert telling us what Robert could tell us if he were alive and if at the time the defendant was assaulting him he had been able to talk.

Transcript at 2671.

The preceding two passages represent an appeal to the jury's emotion, rather than reason. For one thing, Robert would be unable to testify in any scenario because Robert was 13 months old at the time of his death. But more importantly, to claim that Robert was speaking through the doctors who testified at the trial appears oriented toward subtly misleading the jurors about the testimony the medical professionals actually gave. The medical professionals testified about the injuries Robert suffered, and that they were confident, though not certain, that Robert's cranial fracture was more severe than would be caused by the fall Hayes described. But the medical professionals did not testi-

fy that Hayes "assaulted" Robert by "brutally slamm[ing] Robert's head into a hard surface." The foregoing statement by the prosecutor is another example of leveraging the authority and credibility of medical experts to support assertions that those experts cannot—and in most cases, did not—put forward.

### 2. *Hayes's Parenting Skills*

Well how much does a two year old like [C.A.] listen? How much does a thirteen month old like Robert listen? What are the defendant's expectations? What frustrates parents or adults taking care of kids when kids don't meet your expectations?

Transcript at 2688.

Does the defendant expect these kids to act like little adults? And [M.H.], she's five years old at the time. She's expected to pick up her room, clean up the yard because they're bringing all the junk home. And the defendant, what's he doing? Apparently not doing housework, that's up to the kids. He apparently does change diapers but his method for doing that in the case of Robert is he sticks him in the tub and washes him off and puts a diaper on him. How did the defendant refer to these children that he claims to love as his own? "These f-ing kids." That tells us something about the defendant's attitude and thus his actions toward [T.D.'s] kids.

Transcript at 2688–89.

And where is he when he's making that phone call? He's outside the house. Is he outside the house because Robert's been crying even before that and is starting to get to him so he goes out on the porch? Cause [C.A.]'s home. She's watching this DVD, you know, "Surf's Up,"—kinda put in the DVD, that's better than having to interact with the kids.

You know, kind of built in babysitting with the television set.

Transcript at 2692.

Again, is that expecting a ten year old child to act like an adult? Who's the adult in this situation? Who's the caretaker for Robert? Who's the one that [T.D.] was depending on to watch out for her kids?

Transcript at 2707.

In the preceding passages, the prosecutor repeatedly insulted and ridiculed Hayes's parenting methods. At best, the prosecutor's insulting and mocking statements were irrelevant and unprofessional. But given the other examples of troubling prosecutorial conduct found in this case, the prosecutor's words might be viewed as part of a broader effort to convince the jury that, because Hayes is a bad person, they should feel comfortable finding him guilty even if they harbor doubts about the sufficiency of the State's evidence. While prosecutors are permitted some latitude to make mistakes without undue fear that appellate courts will construe their statements as intentional wrongdoing, at a certain point, a pattern of minor transgressions becomes too conspicuous to ignore and too convenient to excuse. I fear this case presents such a scenario.

### 3. *Explanation of Fall*

Now the defendant tells [B.C.] that he's not sure how Robert had fallen because he didn't pay attention to how he landed. How reasonable is that for an adult who's concerned about a child, particularly one as young as Robert that when he starts to fall, he isn't gonna watch what's happening to the kid. I submit that most adults in that situation are not gonna let go of a child.

Transcript at 2704.

To suggest that Hayes's split-second act, taken while suddenly and unexpectedly falling, can somehow demonstrate that

Hayes had no concern for Robert's welfare is absurd. Even professional football players—among the finest athletes in the world—often fumble when hit unexpectedly, and their livelihoods depend on holding onto the ball. Moreover, had Hayes failed to let go of Robert, as the prosecutor appears to suggest as a preferable alternative, Hayes may well have landed on Robert, perhaps placing him in even greater danger. A useful test is this: had Robert been crushed under Hayes, would the prosecutor have described Hayes's refusal to let go of him as a demonstration of care and concern? It is hard to believe that anyone could read this closing argument and answer that question in the affirmative.

### 4. A "Child Molester"

He says that he would, "beat the shit out of a man" but he denied being a "woman beater," a "child beater" or a "child molester." We are not accusing the defendant of being a child molester.

Transcript at 2715.

This statement by the prosecutor is particularly egregious. The prosecutor appears to include this passage in his closing argument solely for the purpose of repeating the phrase "child molester" to a jury already bombarded with emotionally powerful descriptions of severe injuries to young children. There is no suggestion anywhere in the record that Hayes engaged in any sort of sexual abuse of T.D.'s (or any) children, so the act of priming the jury with even more emotionally charged, disgust-provoking language appears to have been a calculated plan to induce attitudes of revulsion toward the defendant for reprehensible acts that he simply did not commit.